# Illinois Official Reports

## Appellate Court

---

### *People v. Slabon*, 2018 IL App (1st) 150149

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDREW SLABON, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-15-0149 |
| Filed | August 20, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-2711; the Hon. Catherine M. Haberkorn, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Michael Gomez, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Riebana E. Sachs, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Presiding Justice Pierce and Justice Mikva concurred in the judgment and opinion. |

## OPINION

¶ 1    Defendant, Andrew Slabon, appeals his conviction of aggravated battery after a jury trial, for which he was sentenced to 50 months' imprisonment. On appeal, defendant contends (1) he was denied his right to present a defense where the trial court barred him from presenting testimony about his state of intoxication, barred him from cross-examining witnesses about his intoxication, and did not allow him to argue that his intoxicated state was relevant in determining whether defendant possessed the requisite *mens rea* for an aggravated battery conviction and (2) the trial court erred when it instructed the jury that voluntary intoxication was not a defense and refused to instruct the jury on the lesser-included offense of simple battery where he presented slight evidence that he did not know the person he kicked was a nurse. Defendant also requests that the clerk of the circuit court correct his mittimus to properly reflect the name and statutory citation of his convicted offense. For the following reasons, we affirm defendant's conviction and sentence and order the clerk to correct the mittimus to reflect a conviction for aggravated battery of a registered nurse pursuant to section 12-3.05(d)(11) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/12-3.05(d)(11) (West 2014)).

¶ 2                                JURISDICTION

¶ 3    Defendant was sentenced on December 11, 2014. He filed a notice of appeal that same day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below (Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. Dec. 11, 2014)).

¶ 4                                 BACKGROUND

¶ 5    The following facts are relevant to this appeal. Defendant was charged with one count of aggravated battery for kicking Lauren Benjamin while she was performing her duties as a nurse. Defendant represented himself throughout the proceedings. Prior to trial, the State filed a motion *in limine* to prevent defendant from presenting a defense of voluntary intoxication. The State argued that Illinois law no longer recognizes such a defense because section 6-3 of the Criminal Code (720 ILCS 5/6-3 (West 2014)), provides only that an intoxicated person may not be criminally responsible for conduct if "such condition is involuntarily produced." Defendant responded that he had no intention to use that defense and that his theory of defense was "that this never happened, this incident never occurred." However, he wanted to present a toxicology report indicating his high blood alcohol level at the time of the incident because "it has to do with why [he] was even in the hospital" and "has something to do with" the "knowing" element of aggravated battery where he "did not voluntarily walk into this hospital." The court granted defendant time to research the issue, and at a later hearing, defendant stated he had no objection to the motion. Before jury selection, defendant noted the motion *in limine*, but stated that while he was not raising voluntary intoxication as a defense, his intoxication was relevant to whether he possessed the requisite state of mind. The trial court stated that it would allow "[n]othing about voluntary intoxication, as it is not a defense in Illinois."

¶ 6        On January 27, 2014, Officer Angelo Sanchez and his partner, Officer James Mackin, were dispatched to 2644 North Mason Avenue in Chicago, Illinois, to conduct a possible death investigation. The officers entered the residence and noticed emergency personnel tending to a woman on the floor. Officer Sanchez observed defendant sitting on a couch about six or seven feet away, screaming hysterically, flailing his arms, and trying to get up. He tried to calm defendant down, but defendant did not respond. The officers moved defendant to another location in the house but he did not cooperate. For their safety as well as defendant's, the officers handcuffed him so they could transfer him to a bedroom.

¶ 7        After being moved, defendant kept trying to go back to the living room, and the officers unsuccessfully tried to calm him down. They called for backup, and Officers Jerry Adamski and David Cummens came to the bedroom. When defendant was informed that the woman was deceased, he continued to scream and said he wanted to kill himself. He yelled, "I can't believe this is happening. I can't believe that she is gone. I don't want to live anywhere." Concerned for defendant's well-being, Officer Sanchez called an ambulance for defendant pursuant to Chicago Police Department procedures. Defendant was still kicking and screaming when the ambulance arrived, and the officers did not want to upset him further so they decided to escort him out from the back of the house. Two firefighters, as well as Officers Adamski and Cummens, assisted defendant out to the ambulance. Defendant continued to state that he wanted to kill himself and he was taken to Our Lady of Resurrection Hospital.

¶ 8        Chicago Fire Department emergency medical technician (EMT) Morris Bishop testified that on January 27, 2014, he and his partner Quentin Strong responded to a psychiatric emergency at a residence. They entered the residence and saw a woman lying on the floor. EMT Bishop heard a man, later identified as defendant, scream and curse in a back room. He watched defendant being escorted from the room, handcuffed. Defendant was belligerent. EMT Bishop attempted to take defendant's vitals and history in the ambulance, but defendant was very combative. Defendant continued to yell, jerk, and kick on the way to the hospital. At the hospital, defendant was placed in a wheelchair and taken to the nurse's station. EMT Bishop could not recall defendant's exact words when he was yelling and screaming.

¶ 9        Officer Cummens testified that on January 27, 2014, he and Officer Adamski responded to a call for assistance. When they arrived, defendant was loud and upset, using profanity, and flailing his legs. After he learned the woman was deceased, he threatened "I don't want to live anywhere. Just kill me, I want to kill myself." Following police procedure, they called an ambulance for defendant and when it arrived, Officer Cummens escorted defendant through a rear door to the ambulance and rode with him and a paramedic to the hospital. While in the ambulance, defendant refused to lay down on the gurney or give any personal information. He told the EMT to "Go f*** yourself." Defendant was very angry during the ride and started kicking the gurney. At the hospital, Officer Cummens escorted defendant to the emergency room, and at the main desk, Benjamin introduced herself as one of the nurses and offered defendant a glass of water. A doctor also introduced himself to defendant, who remained very agitated and refused to answer questions.

¶ 10       Officer Cummens accompanied defendant, Benjamin, other hospital personnel, and a security guard to room number 7. Benjamin reintroduced herself to defendant, explaining that she was there to help him and needed to take his vitals. Defendant refused to lay down on the hospital bed and asked her if she was Jewish. Throughout defendant's cursing and belligerent behavior, Benjamin remained calm and professional. When she tried to take his vitals,

defendant said, "Don't touch me, you dirty Jew. Leave me alone." The officers removed defendant's handcuffs so Benjamin could take his vitals but cuffed his wrists to the rails of the hospital bed. Defendant continued to yell profanities and insults at Benjamin as she put an oxygen mask on him, and he threatened to spit on people. Defendant's wrists and legs were eventually placed in soft restraints. Benjamin noticed that defendant's oxygen mask had slipped and went to readjust the mask. At this point, the soft restraints were on defendant's ankles only and had not been attached to the bed. As she adjusted his mask, defendant pivoted his hips, raised his knees to his chin, and kicked Benjamin in the middle of her chest with his feet. She flew backwards 12 or 15 feet and bounced off the counter. The officers handcuffed defendant and placed him under arrest. Benjamin returned to the room and continued to render care to defendant.

¶ 11    On cross-examination, Officer Cummens stated that he did not recall the exact words defendant used when he saw him in the bedroom but knew that defendant was yelling profanities. He did not recall whether defendant was unconscious at any point and denied telling defendant that he was "never going to see [his mother] again" and that "she'll have maggots crawling on her."

¶ 12    Dr. Kenneth Barrick testified that he was working in the emergency room at Our Lady of Resurrection Hospital on January 27, 2014, wearing scrubs and an identification badge, when he observed defendant brought in by two officers. Defendant was rocking back and forth, crying, and cursing. He tried to calm defendant, but defendant continued to rock back and forth, expressing disbelief over his mother's death and using "lots of curse words and expletives." Defendant was placed in room number 7 to isolate him from other patients in the emergency room due to his loud and aggressive behavior.

¶ 13    Dr. Barrick testified that Benjamin was assigned to defendant's care. She also wore scrubs and an identification badge. Benjamin introduced herself to defendant and told him she would be taking care of him. Defendant called her names and told her to "f*** off." Benjamin wanted to take defendant's vitals so personnel repositioned defendant's arms from behind his back to either side of the bed. Defendant continued to shout profanities at Benjamin and although Dr. Barrick tried to de-escalate the situation, defendant focused his aggressions on her. Dr. Barrick ordered physical restraints and chemical restraints consisting of benzodiazepine, Haldol, and Benadryl. Dr. Barrick stated that even after a second injection, defendant remained aggressive. He did not recall whether defendant made suicidal threats in his presence but was concerned about defendant being suicidal.

¶ 14    Dr. Barrick was present in the room when defendant was placed in soft restraints. Defendant's upper extremities were restrained first, and Benjamin began to secure his lower extremities by placing restraints on his ankles. She noticed, however, that defendant's oxygen was low, and she went to the head of the bed to adjust his oxygen mask. As she leaned over to place the mask on his face, defendant brought his knees up to his chest, turned toward Benjamin, and kicked her in the chest. She flew back 8 to 10 feet and struck the cabinets behind her very hard. She stepped out of the room for a moment but returned about a minute later to take care of defendant. Dr. Barrick described Benjamin upon her return as "beyond calm."

¶ 15    On cross-examination, Dr. Barrick stated that he did not ask defendant if he knew where he was or what was going on, but based on defendant's response to his initial questions, Dr. Barrick concluded that defendant was lucid enough to understand his questions. Dr. Barrick smelled alcohol on defendant, but when defendant asked whether he thought defendant was

drunk, the trial court reminded defendant of its ruling that the evidence was not relevant because voluntary intoxication is not a defense in Illinois. The trial court also sustained objections to defendant's question whether alcohol may have contributed to his emotional distress and his attempt to question Dr. Barrick regarding his experience handling intoxicated patients.

¶ 16 Dr. Barrick further testified that when he first saw defendant, he conducted a patient assessment for which he drew blood and conducted a urine toxicology screen. The assessment revealed that defendant tested positive for cannabis and his blood alcohol levels were "244." The trial court sustained objections to defendant's question of whether the administered medications would react with alcohol and whether alcohol had something to do with defendant's behavior. Defendant replied that he was referring to his state of mind, and the trial court explained that voluntary intoxication is not a legal defense.

¶ 17 Benjamin testified that on January 27, 2014, she was working at the emergency department of Our Lady of Resurrection Hospital. She wore scrubs and a badge that identified her as a registered nurse. She observed defendant in a wheelchair, accompanied by two officers and two firefighters. Defendant appeared extremely agitated and was screaming profanities. She overheard defendant ask for a glass of water and she offered one to him. Since he was handcuffed, she held the cup for defendant while he drank. Defendant was taken to room number 7 and Benjamin was assigned to his case.

¶ 18 In the room, Benjamin introduced herself to defendant and told him she would be taking care of him. Two police officers, a hospital security guard, and Dr. Barrick were also in the room. She tried to take defendant's vitals, and defendant called her "a stupid Jew and a dirty b***." Defendant refused to answer any questions and continued to use profanities and insult Benjamin. She asked the officers to remove defendant's handcuffs so she could take his vitals, and they proceeded to restrain his hands to the side rails of the gurney instead. As they did so, defendant looked at Benjamin and said, "[D]on't touch me you dirty Jew. You're a f*** Jew. I know you're a Jew because your eyes are close together." Defendant continued to thrash around and call her names, and she could not take his vitals.

¶ 19 Defendant then made spitting sounds and threatened to spit on everyone in the room. A mask was put on his face but he pulled it down. Dr. Barrick ordered chemical restraints which are medications to help a patient relax when they are a danger to themselves or others. Benjamin administered the chemical restraints via injection in defendant's left thigh. Defendant then told her, "[D]o it again, b***." The injection did not appear to calm defendant. Benjamin then administered the physical restraints starting with defendant's wrists. As she did so, defendant said, "[D]on't touch me you stupid b***, f*** you, you f*** b***." After defendant's wrists were secured, Benjamin started to put restraints on defendant's ankles. Before she could do so, she noticed that his oxygen saturation level was dropping so she retrieved an oxygen mask and tried to put it on defendant. She leaned over him, and as she placed the mask on his head, defendant "pulled his knees into his chest, pivoted his hips and kicked [her] in the chest with both feet." She flew back 8 to 10 feet where she struck a counter and hit an oxygen cylinder before landing on her chest. She got up and left the room. She was in pain and felt scared, angry, and frustrated. However, she soon returned to room number 7 to continue defendant's treatment.

¶ 20 On cross-examination, Benjamin stated that she did not remove defendant's clothes nor was she in the room when they were removed. She testified that defendant's blood alcohol

level was 0.244 and she knew he was intoxicated. She placed a catheter on defendant to obtain a urine sample and to ensure that he was not under the influence of drugs.

¶ 21　　Defendant testified in his defense. He stated that on January 27, 2014, he was hysterical and crying when paramedics arrived to render aid to his mother. He recalled Officer Sanchez and that he felt "safe" around him and felt no "resentment towards anybody at that point." Defendant remembered being in his mother's room, lying on her bed, and looking up to see Officer Sanchez there. He asked the officer what was going on, and the officer told him they were there to render aid to his mother. Defendant remembered being handcuffed and that he could not stand. He stated that he "had been drinking that day" and "had been drinking for the whole year of 2013." Defendant then talked about how he began to drink on New Year's Eve of 2012, how 2013 "was pretty much a blur," and the State objected. The trial court sustained the State's objection.

¶ 22　　Defendant testified that he remembered "being escorted out of the house—before that, I remember being sat down at the couch" and the paramedic told him that there was nothing they could do. Defendant started crying and became hysterical. He recalled being taken out of the house and that "we need to take you to the hospital, or something to that effect." They left out the back door, and he noticed that the door leading to his attic apartment "was wide open." He remembered "closing it before [he] left because [his] mom always closed the door, and it got cold for her. So [he] closed the door."

¶ 23　　Defendant did not recall walking to the ambulance, but he remembered riding in the ambulance with the sirens on. The paramedic asked his name and "all of a sudden it kicked in why [he] was there. [He] realized that [his] mother had passed, and [he] started crying again." Defendant did not remember being taken out of the ambulance, but he recalled being in the emergency room and Dr. Barrick talking to him. Defendant said, "please, somebody, just euthanize me. Please put me out of my misery. I'm suffering here." He recalled being in room 7 and having a "dialogue with Officer Cummens." Defendant stated that the dialogue was not serious. They were going back and forth, with Officer Cummens calling defendant a "momma's boy" and that he "should man up." The officer called defendant a "p***," and defendant told Officer Cummens that he was "a parasite" and "a drain on taxpayers." Defendant testified that he was "trying to be intelligent about it" and did not call the officer names. He was no longer crying, as the conversation "got [his] mind off what was going on."

¶ 24　　At this point, Benjamin walked in and asked, "Who's a momma's boy?" Defendant responded, "Great. Look. A Jew." Defendant testified that when she walked in, he "didn't know [she] was Ms. Benjamin at that time. She never identified herself to [him] at that time." He and Benjamin continued back and forth, and defendant "didn't feel safe." He told Benjamin that she was overweight. Someone then said defendant needed to be restrained and he refused. He told them he did not "want to be restrained" and that he wanted to leave. He remembered that an officer and his partner were in the room. Although they did not speak to him, defendant recalled that Benjamin "was definitely antagonistic. She was going back and forth with [him.] She was not a professional nurse, and [he] did not feel like [he] was among professionals."

¶ 25　　Defendant testified that Benjamin walked in with a syringe and a bottle and she injected him. He stopped moving while she injected the medicine "because if the needle [broke] in [his] leg, [it was] going to be an issue." He felt a little better after the injection so he asked Benjamin to "please give me another shot." She injected him again and defendant "was out." When he awoke, his clothes "were completely gone" and a tube was inserted into his penis. Officer

- 6 -

Cummens said, "How do you feel, tough guy?" He told defendant that his mother was gone and he would never see her again. Defendant stated that he did not break out of the restraints.

¶ 26    On cross-examination, defendant stated that he recalled being at the hospital but also that at times he did not know whether he was at the hospital or in the emergency room. He did not recall Benjamin introducing herself to him, nor could he recall that she told him she was his nurse. He acknowledged that at certain points, he "was probably aware of [his] surroundings." Defendant did not recall being transferred from a wheelchair to a gurney or kicking Benjamin in the chest. Defendant stated that he could not raise his legs to kick Benjamin because he was restrained.

¶ 27    During closing argument, defendant argued that he was "unreceptive" on that day due to the circumstances. He argued that he was "taken from [his] home, brought to a hospital, and [he] was injected with drugs, and at that time the State and the witnesses allege [he] kicked this nurse." He argued that "if a patient is not in control of his faculties and his psychological issues, how can that patient be responsible?" He claimed he could not have known the circumstances of that day in the hospital because of his severe emotional distress in finding his mother dead and his state of intoxication. The trial court sustained the State's objection, reminding defendant that voluntary intoxication was not a defense. The jury was also given Illinois Pattern Jury Instructions, Criminal, No. 24-25.02 (4th ed. 2000) (hereinafter IPI Criminal 4th), which stated that voluntary intoxication is not a defense. The trial court refused defendant's request to instruct the jury on the lesser included offense of battery, finding that the evidence established Benjamin was a nurse. After deliberations, the jury found defendant guilty of aggravated battery.

¶ 28    Defendant filed a motion for a new trial. He argued that the trial court's statement during cross-examination that voluntary intoxication is not a defense misled the jury to believe defendant's state of mind was not an issue. Also, defendant argued the trial court erred in giving IPI Criminal 4th No. 24-25.02 and in failing to instruct the jury on the offense of simple battery. The trial court denied defendant's motion, and he was sentenced to 50 months' imprisonment followed by one year of mandatory supervised release. Defendant filed this timely appeal.

¶ 29                                            ANALYSIS

¶ 30    Defendant contends he was denied his right to argue at trial that he did not possess the requisite *mens rea* for aggravated battery, where the trial court found evidence of his state of intoxication irrelevant and barred him from presenting such testimony. A defendant has the right to present a defense and to present his version of the facts to the jury. *People v. Manion*, 67 Ill. 2d 564, 576 (1977). However, the admissibility of evidence at trial is ultimately within the sound discretion of the trial court, and a reviewing court will not disturb the trial court's determination absent an abuse of discretion. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). An abuse of discretion occurs where the court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the court. *Id.*

¶ 31    Defendant was charged with aggravated battery under section 12-3.05(d)(11) of the Criminal Code (720 ILCS 5/12-3.05(d)(11) (West 2014)), which provides that a person commits this offense "when, in committing a battery," "he or she knows the individual battered to be" a "nurse while in the performance of his or her duties as a nurse." On appeal, defendant argues that he wanted to present evidence of his intoxication in order to show that, in his

inebriated state, he did not know Benjamin was a nurse. The State, however, argues that the trial court correctly found this evidence irrelevant because voluntary intoxication is no longer a defense under Illinois law.

¶ 32     The State points to section 6-3 of the Criminal Code, which provides that "[a] person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." 720 ILCS 5/6-3 (West 2014). The State contends, pursuant to this provision, that a person in an intoxicated condition is not criminally responsible for conduct only if the condition is *involuntarily* produced. Our primary goal in interpreting a statute is to ascertain and give effect to legislative intent, expressed by the statute's plain and ordinary language. *Lawler v. University of Chicago Medical Center*, 2017 IL 120745, ¶ 12. Where the statute's terms are clear and unambiguous, a court may not read into it exceptions, limitations, or conditions not expressed by the legislature. *Id.*

¶ 33     We agree with the State's interpretation and with its argument that because section 6-3 does not mention voluntary intoxication, that condition cannot be a defense to criminal conduct under the statute. This interpretation also corresponds with the general principle under Illinois law that "voluntary intoxication is not a defense to a criminal charge." *People v. Redmond*, 265 Ill. App. 3d 292, 302 (1994). We do not find, however, that the omission of voluntary intoxication in section 6-3 means this condition is never relevant in a criminal proceeding. Rather, a person's state of voluntary intoxication may be relevant in the commission of specific intent crimes, which "require proof of an additional special mental element." *People v. Robinson*, 379 Ill. App. 3d 679, 684 (2008). Courts have long recognized that "where voluntary intoxication is so extreme as to suspend entirely the power of reasoning," a defendant is incapable of forming a specific intent or malice. *People v. Cunningham*, 123 Ill. App. 2d 190, 209 (1970) (and cases cited therein). It follows that if aggravated battery is a specific intent offense, defendant's state of voluntary intoxication is relevant to negate that specific intent, even if it does not provide an affirmative defense against his criminal conduct.

¶ 34     Our appellate districts are split on whether aggravated battery is a specific intent offense. See *People v. Conley*, 187 Ill. App. 3d 234, 241 (1989) (listing cases showing the split and finding that inconsistent decisions exist within the First District). However, we need not decide the issue here because regardless of whether aggravated battery is a specific intent crime, the criminality of defendant's conduct depends on whether he acted knowingly or intentionally. *People v. Phillips*, 392 Ill. App. 3d 243, 258 (2009). The evidence presented at trial, including defendant's own testimony, shows that he had the requisite knowledge to commit aggravated battery under section 12-3.05(d)(11), notwithstanding his intoxicated state.

¶ 35     "Knowledge, due to its very nature, is ordinarily proven by circumstantial evidence, rather than by direct proof." *People v. Smith*, 124 Ill. App. 3d 243, 248 (1984). To prove knowledge by circumstantial evidence, the State must present sufficient facts from which an inference of knowledge can be made. *In re Keith C.*, 378 Ill. App. 3d 252, 260 (2007). To convict defendant of aggravated battery under section 12-3.05(d)(11), the State must show that defendant kicked Benjamin knowing she was a nurse performing her duties. 720 ILCS 5/12-3.05(d)(11) (West 2014). Defendant argues that he did not know Benjamin was a nurse because she never introduced herself as such and, furthermore, he could not comprehend his surroundings or

circumstances due to his compromised mental state. The evidence presented at trial contradicts defendant's claims.

¶ 36    Testifying for the State, Officer Cummens, Dr. Barrick, and Benjamin all stated that Benjamin introduced herself to defendant as a nurse who would be caring for him. They also testified that as Benjamin tried to put an oxygen mask on defendant, he pulled up his knees, turned his legs toward her chest and kicked her. Defendant contends he did not comprehend what was happening. However, he testified that he knew why the paramedics and officers were at his residence, he recalled being moved from a sofa to another room, and he recalled being led out of a back door to an ambulance. Defendant noticed that the door leading to his attic apartment "was wide open," and he remembered "closing it before [he] left because [his] mom always closed the door, and it got cold for her. So [he] closed the door." Defendant recalled riding in the ambulance and being in the emergency room of the hospital. He recounted in detail the dialogue he had with Officer Cummens, who called defendant a "momma's boy," and stated that he was "trying to be intelligent about it." He stopped crying as the conversation "got [his] mind off what was going on." He recalled talking with Dr. Barrick and cursing at Benjamin, calling her a "Jew." He stated that Benjamin "was not a professional nurse, and [he] did not feel like [he] was among professionals." Defendant recalled that she came in with a syringe and injected him, and since he felt a little better after the injection, he asked her for another one. Although he was agitated, defendant stopped moving while Benjamin injected the medicine "because if the needle [broke] in [his] leg, [it was] going to be an issue."

¶ 37    The detail and extent of defendant's recall show an acute awareness of his surroundings and disprove any notion that he did not know Benjamin was a nurse when he kicked her. *People v. Madej*, 106 Ill. 2d 201, 216-17 (1985); *People v. Smith*, 195 Ill. 2d 179, 195 (2000). Defendant's conduct does not support his argument that he lacked "the mental state of knowledge" for aggravated battery due to his intoxication. *People v. Weir*, 111 Ill. 2d 334, 340 (1986). Given the overwhelming evidence of defendant's guilt, any error the trial court may have committed by barring evidence of his mental state of intoxication was harmless. See *People v. Patterson*, 217 Ill. 2d 407, 428 (2005).

¶ 38    Furthermore, defendant was not deprived from presenting his theory of defense. A defendant has the right to present a defense and to present his version of the facts to the jury. *Manion*, 67 Ill. 2d at 576. At the hearing on the State's motion *in limine*, defendant stated his theory of defense was "that this never happened, this incident never occurred." He testified in his defense that after he received a second injection, he "was out." Defendant stated that he did not break out of the restraints. On cross-examination, he reiterated that he could not raise his legs to kick nurse Benjamin because he was restrained. Defendant also testified that due to his extreme emotional distress, he was not always aware of his surroundings. He did not recall being transferred from a wheelchair to a gurney, or kicking nurse Benjamin in the chest. Numerous State witnesses testified as to defendant's agitated, distressed state, and defendant was able to cross-examine witnesses about whether defendant appeared to know what was happening around him. Defendant also managed to present evidence that he had been drinking heavily, and that his blood alcohol level measured at 0.244. This evidence allowed the jury to consider defendant's version of the incident; therefore, he was not denied an opportunity to present crucial matters explaining his actions. *Id.* at 577.

¶ 39    Next, defendant contends the trial court erred when it instructed the jury, over his objection, that "[a] voluntarily intoxicated condition is not a defense to the charge of

aggravated battery." Defendant argues that the instruction is an inaccurate statement of the law, since voluntary intoxication can negate a specific intent, and it misled the jury into thinking "it could not consider [defendant's] intoxication at all." Whether to give a particular jury instruction is within the sound discretion of the trial court, and the court "does not abuse its discretion so long as, 'taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles.' " *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 203 (2006) (quoting *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273-74 (2002)). However, whether a jury instruction correctly states the law is a question we review *de novo*. *People v. Pierce*, 226 Ill. 2d 470, 475 (2007).

¶ 40    As we discussed above, "voluntary intoxication is not a defense to a criminal charge." *Redmond*, 265 Ill. App. 3d at 302. Also, although voluntary intoxication can negate specific intent, courts disagree on whether or not aggravated battery is a specific intent offense. In fact, a recent First District case found that aggravated battery was not a specific intent offense. See *People v. Brown*, 2015 IL App (1st) 134049, ¶ 44. Furthermore, the trial court's instruction did not inform the jury it could not consider defendant's intoxication at all, only that voluntary intoxication cannot be a defense to the charge of aggravated battery. We find that the trial court's instruction accurately stated the law.

¶ 41    The trial court also did not abuse its discretion in giving the instruction. Although the court did not allow defendant to present evidence of his intoxicated state as a defense to the charge of aggravated battery, it did allow evidence showing that he was intoxicated. Defendant testified that he had been drinking that day. Dr. Barrick testified that he smelled alcohol on defendant. He further testified that when he first saw defendant, he conducted a patient assessment for which he drew blood and conducted a urine toxicology screen. The assessment revealed that defendant tested positive for cannabis and his blood alcohol level was "244." Nurse Benjamin testified that defendant's blood alcohol level was 0.244 and she knew he was intoxicated. As such, "the State was entitled to an instruction that protected against adverse inferences which might have been drawn from" this evidence of intoxication. *People v. Johnson*, 110 Ill. App. 3d 965, 969 (1982).

¶ 42    Next, defendant argues that the trial court should have instructed the jury on the lesser-included offense of simple battery where defendant testified that he did not know Benjamin was a nurse. Defendant correctly points out that "[a]n instruction on the lesser-included offense is appropriate where the charged greater offense requires the jury to find a disputed factual element that is not required for conviction of the lesser-included offense." *People v. Garcia*, 188 Ill. 2d 265, 284 (1999). Such an instruction is proper where slight evidence exists that tends to prove the lesser-included offense rather than the greater. *Id.* at 284-85. The question is whether any evidence was presented at trial supporting this instruction.

¶ 43    Contrary to his argument on appeal, defendant did not testify at trial that he was unaware Benjamin was a nurse. Rather, he testified that when she walked in, he "didn't know [she] was Ms. Benjamin at that time. She never identified herself to [him] at that time." Defendant was referring to the fact that she did not tell him her name, not whether she was a nurse. The circumstantial evidence shows that defendant clearly knew Benjamin was a nurse. He never questioned why she was in his hospital room or why she was using a syringe to inject him with medicine. He even asked her to administer more medicine after he began to feel better from the

first injection. When speaking of her during his testimony, defendant stated that Benjamin "was not a professional nurse, and [he] did not feel like [he] was among professionals" when he interacted with her. Throughout his testimony and his cross-examination of the State's witnesses, defendant never questioned her status as a nurse. "Where the evidence undisputedly satisfies the elements which distinguish aggravated battery from simple battery, no simple battery instruction is required to be given." *People v. Krone*, 98 Ill. App. 3d 619, 623 (1981).

¶ 44 Even if the trial court erred in refusing to instruct the jury on the offense of simple battery, a new trial is warranted only if defendant is prejudiced by the error. *Dahan v. UHS of Bethesda, Inc.*, 295 Ill. App. 3d 770, 777 (1998). As discussed above, the overwhelming evidence presented at trial shows that defendant kicked nurse Benjamin while knowing at the time that she was a nurse performing her duties. We find no reversible error here.

¶ 45 Finally, defendant argues that his mittimus should be corrected to reflect the proper offense of which he was convicted. Presently, his mittimus shows a conviction of aggravated battery pursuant to section 12-3.05(d)(5) (720 ILCS 5/12-3.05(d)(5) (West 2014)), which refers to battery against a "judge, emergency management worker, emergency medical technician, or utility worker." The State agrees that the mittimus should be corrected to reflect defendant's conviction for aggravated battery of a registered nurse pursuant to section 12-3.05(d)(11) (*id.* § 12-3.05(d)(11)). Therefore, we should order the clerk of the court to correct defendant's mittimus to reflect his conviction for aggravated battery under section 12-3.05(d)(11) of the Criminal Code.

¶ 46 For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 47 Affirmed.