2023 IL App (1st) 211591-U

No. 1-21-1591

Order filed April 17, 2023

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 10142 |
| | ) | |
| CORTEZ PETERS, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Lavin and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for aggravated battery is affirmed where (1) a rational trier of fact could have found that he knew the victims were emergency medical technicians, and (2) the trial court complied with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).

¶ 2    Following a jury trial, defendant Cortez Peters was found guilty of two counts of aggravated battery to an emergency medical technician (EMT) and sentenced to 7 years in prison on each count, to be served concurrently. On appeal, defendant argues that (1) the State failed to

prove that he knew the victims were EMTs and (2) the trial court improperly admonished the jurors concerning the principles set forth in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).

¶ 3    Defendant was charged by indictment with one count of attempt first degree murder, and nine counts of aggravated battery. The State proceeded to trial against defendant on one count of attempt first degree murder of EMT Katherine McDermott (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2018)) and two counts of aggravated battery of McDermott and EMT Christina DeJesus while they were performing their official duties (720 ILCS 5/12-3.05(d)(5)(i) (West 2018)).

¶ 4    On August 6, 2019, at defense counsel's request, the court ordered defendant undergo a behavioral clinical examination (BCX) to determine his fitness for trial. At the October 1, 2019 fitness hearing, Dr. Fidel Echevarria testified that defendant was "mentally unfit to stand trial," but with appropriate services, could "attain fitness to stand trial within a statutory period of one year." The court found that defendant was "unfit to stand trial and also that he [could] be restored within one year." Approximately a year later, the court held that defendant was "restored, that he [was] fit to stand trial with medications."

¶ 5    During *voir dire*, the court admonished the venire about the four principles contained in Illinois Supreme Court Rule 431(b). Specifically, the judge explained that "anybody placed on trial in a criminal case is presumed to be innocent of the charge or charges against him ***" and that defendant "is presumed to be innocent and there's no evidence against him." The judge then asked, "Is there anybody who does not accept nor understand this constitutional principle in the courtroom? Please raise your hand." No one raised their hand.

¶ 6     Next, the judge discussed "the burden of proof and who has the burden of proof." The judge explained that in a "criminal case, the burden of proof is proof beyond a reasonable doubt,

and this is the highest burden of proof at law. The State has the burden of proof beyond a reasonable doubt through each and every stage of the trial." The judge asked: "Is there anybody who does not accept nor does not understand that constitutional principle in our courtroom? Please raise your hand." No one raised their hand.

¶ 7     The next constitutional principle the court addressed was that "the defendant is not required to prove his innocence. He does not have to put any evidence on, he may rely upon the presumption of innocence." The judge asked, "Is there anybody who does not accept nor understand that constitutional principle? Please raise your hand." No one raised their hand. The judge further explained that "anybody placed on trial in a criminal case has a constitutional right to take the witness stand and testify on their own behalf, and if [defendant] decides to do that, you have to judge his testimony like you would any other witness." Once again, the judge asked: "Is there anybody who does not accept nor understand that constitutional principle? Please raise your hand." No one raised their hand.

¶ 8     Finally, the judge stated that "If you look at this as a constitutional coin and turned it over, anybody placed on trial in a criminal case has a constitutional right not to testify. And if [defendant] decides not to testify, no inference whatsoever can be gained from his silence." The judge concluded by asking, "Is there anybody who does not understand nor accept that constitutional principle? Please raise your hand. Let the record indicate nobody has raised their hand."

¶ 9     At trial, McDermott testified that on June 10, 2019, she and her partner DeJesus were working as EMTs for "MedEx," a private ambulance company that responds to the same calls as the Chicago Fire Department and other EMT services. While on duty, employees typically wear a long or short sleeve button-up shirt with the MedEx logo or a white shirt, black cargo pants and

laced-up black or combat boots. Employees are permitted to wear an outside jacket over their shirt. MedEx ambulances resemble other ambulances and are equipped with lights, sirens, video cameras and audio recorders.

¶ 10     At around 3 a.m. on June 10, 2019, McDermott and DeJesus were assigned to transport defendant from the University of Chicago Hospital to Hartgrove, a psychiatric hospital. McDermott was wearing a gray zip-up, dark pants, and dark shoes. McDermott's clothing did not state "MedEx" or "EMT" on it, and she was not wearing a badge. DeJesus drove the MedEx ambulance to the hospital.

¶ 11     When McDermott and DeJesus arrived at the hospital emergency room, a male nurse[1] admitted them into a secured area designated for psychiatric patients. While McDermott filled out paperwork at the nursing station, DeJesus went to "collect" defendant. When McDermott first saw defendant, he was on a stretcher covered in a white sheet, from over his head down to his toes. At the hospital, McDermott told defendant who she was and where they were going but he did not respond.

¶ 12     The nurse accompanied McDermott and DeJesus as they moved defendant through the hospital and helped lift defendant into the ambulance. The nurse had a syringe and a vial of medication, which McDermott assumed was a sedative, to be administered as needed. McDermott was not told, and the paperwork did not reflect, whether defendant had received any medications that day. Defendant was quiet and calm at the hospital. He "just wanted to be left alone" and did not respond when McDermott spoke to him. Defendant was belted onto the stretcher at the shins,

---

[1] The male nurse's name is not included in the record on appeal.

waist, and over his shoulders, but he could move his hands. No additional restraints were deemed necessary at that point.

¶ 13    During the transport, DeJesus drove and McDermott sat in the back of the ambulance with defendant. McDermott kept the lights off so as not to disturb defendant, but "low lights" automatically stay on. After a few minutes, defendant took his head out from under the sheet and began mumbling. Defendant "proceeded to look around" and was "flexing his feet." McDermott assumed defendant was testing the tightness of the bottom restraint. Then McDermott heard the seatbelt unbuckling and saw that defendant was out of the stretcher. Defendant struck McDermott in the head with a "cellular brick-type phone" they kept in the ambulance, causing her to briefly lose consciousness.

¶ 14    When McDermott regained consciousness, she was "violently and repeatedly" being thrown against the wall of the ambulance. Defendant grabbed McDermott's hair, looked her in the eyes, and said he was "going to f*** kill [her]." He punched her face with a closed-fist for an "extended period of time" and threw her against the wall of the ambulance four or five times, "too many to count."

¶ 15    When defendant released McDermott, he moved toward the front of the ambulance where DeJesus was driving. McDermott could not get out of the ambulance because she was blocked in a corner by defendant's body and the stretcher. When McDermott brushed up against defendant while trying to open the side door (so defendant could exit the ambulance), he picked her up, slammed her against the wall, and repeatedly punched her in the face. Defendant "stopped hitting [McDermott] on his own accord." He exited the ambulance, but then came back and "continued to

beat [her]." After McDermott threw defendant's belongings towards the driver's side door, he picked them up and left. She did not see him again that night.

¶ 16    Police officers equipped with body-worn cameras arrived at the scene. McDermott observed that DeJesus had disheveled hair and slight swelling on her face and neck. McDermott was subsequently treated at the University of Chicago Hospital for a broken nose, fractured left orbital, and microfractures on the bottom grill of her teeth. She lost two-thirds of her front teeth and was diagnosed with concussion syndrome, causing periods of forgetfulness. She also suffered vertigo and migraine-like headaches for about a year after the incident. Photographs showing injuries to McDermott's face, including scabbing above her lips and on her jawline were admitted into evidence. McDermott testified that she had a pending lawsuit against the University of Chicago based on this incident.

¶ 17    A still image taken from the police body-worn camera from approximately 15 minutes after the incident was also admitted into evidence. In the image, McDermott and DeJesus are standing in front of the back doors of an ambulance, which is clearly marked "Ambulance." DeJesus is on the left, wearing a white shirt with a patch above the left breast pocket. There is writing on the patch, but the words are illegible in the photo. McDermott is slightly behind her and to the right, wearing a gray zip-up, white shirt, and black pants.

¶ 18    The exterior video and interior audio ambulance recordings were also admitted into evidence. The video footage shows the ambulance moving down a street. In the audio recording, McDermott is heard saying, "pull over." DeJesus asks, "why?" McDermott responds, "because he's getting out." Scuffling noises are heard. McDermott says, "you need to stop." Defendant responds, but his words are indistinct. Less than 10 seconds later, defendant says, "I'll kill you and

cut your neck" and continues to speak indistinctly. McDermott yelps, and more scuffling sounds are heard. Defendant asks, "where are my things?" McDermott responds, "right behind you." Defendant responds, but his words are inaudible. McDermott says, "okay, get out, just please get out." A door opens and closes, followed by rattling noises. Defendant says, "don't look back." DeJesus is heard on the phone with 911, stating she and her partner had just been assaulted by a "psych patient."

¶ 19    DeJesus corroborated that she and McDermott were assigned to transport defendant from the University of Chicago Hospital to Hartgrove on June 10, 2019. When they arrived at the hospital, McDermott began the paperwork while DeJesus accompanied the nurse to defendant's room. The lights in his room were off and defendant appeared to be sleeping. The nurse helped DeJesus move defendant from the bed to the stretcher and buckle the straps, and indicated that he had medication to use "if things don't work out" or something to that effect. After McDermott, DeJesus, and the nurse reached the garage, McDermott entered the ambulance while the nurse helped DeJesus secure defendant. As he was being loaded into the ambulance, defendant briefly uncovered his face and told the nurse "not to give out his information." The nurse agreed not to do so.

¶ 20    Although nothing unusual occurred while moving defendant from his hospital room into the ambulance, shortly after pulling out of the hospital garage, DeJesus heard a strange sound from the back of the ambulance. While she was pulling the ambulance over, defendant "got up in the front really fast" and started punching her in the face.

¶ 21    When she parked the ambulance, defendant tried to grab her phone from her. He was "grabbing the wires and ripping everything, *** grabbing all this stuff." He placed his hands on

her throat and hair, and threatened to snap her neck if she did not drop the phone. DeJesus dropped the phone, and defendant released her and started "stomping" on the phone.

¶ 22 DeJesus jumped out of the ambulance and ran across the street. When she looked back, she saw defendant look at her for a second and go back to the ambulance. DeJesus ran back to the ambulance, retrieved her phone, and called 911. While she was standing outside the ambulance, DeJesus saw defendant exit on the passenger side, turn around and start pulling on all of the door handles. McDermott was still inside when defendant reentered the ambulance through the open driver's door. While DeJesus was talking to the driver of a vehicle she had flagged down, defendant exited the ambulance again. DeJesus and defendant "locked eyes for just a second" before he ran around to the front of the ambulance. She did not see him again that night.

¶ 23 On cross-examination, DeJesus testified that she was able to see in defendant's hospital room even though the lights were off because the hall light was bright. Defendant was under a sheet, which he pulled back over his head after moving onto the stretcher. He remained under the sheet in the hospital.[2] DeJesus thought defendant kept the sheet over his head because the lights were brighter in the hallway than in his hospital room. DeJesus introduced herself to defendant, but did not recall whether she told him where he was going. She believed defendant was asleep, or trying to sleep, since it was 3 a.m. and the nurse had given him "a pill so he was tired." Defendant only "popped his head out for a second" while being placed in the ambulance.

¶ 24 Chicago police detective Robert Slechter testified that he investigated the incident and administered independent photo arrays to DeJesus and McDermott, who both identified defendant.

---

[2] DeJesus refers to the covering as a blanket but, for continuity with McDermott's testimony, we use the word sheet.

McDermott told Slechter that the physical altercation began after defendant took his sheet off and learned he was going to Hartgrove.

¶ 25     The parties stipulated that Dr. Thomas O'Brien treated McDermott on June 10, 2019, at the University of Chicago Hospital Emergency Room. O'Brien diagnosed McDermott with a nasal bone fracture, swelling on her upper left forehead, and a chipped tooth. She was discharged with instructions to apply ice and take ibuprofen to control the pain and swelling. The parties also stipulated that Dr. Marcus Tellerico treated DeJesus on June 14, 2019, diagnosed her with a shoulder sprain and cervical sprain, and prescribed medication for her muscle spasms, pain and swelling.

¶ 26     The jury found defendant guilty of two counts of aggravated battery of McDermott and DeJesus, and not guilty of attempt murder of McDermott. Defendant filed post-trial motions, arguing the evidence failed to establish that he knowingly battered McDermott and DeJesus, which were denied.

¶ 27     The trial court sentenced defendant to seven years in prison on each count, to be served concurrently. Defendant's motion to reconsider sentence was denied.

¶ 28     On appeal, defendant argues the State failed to prove the aggravating element of aggravated battery, that he knew McDermott and DeJesus were EMTs performing their official duties at the time of the offense.

¶ 29     In considering a challenge to the sufficiency of the evidence, this court examines " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443

U.S. 307, 319 (1979)). The State bears the burden of proof beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. A court "is not required to search out all possible explanations consistent with innocence or be satisfied beyond a reasonable doubt as to each link in the chain of circumstances." *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007). This court will draw all reasonable inferences in favor of the State. *Id*. A conviction will not be overturned "unless the evidence is so unreasonable, improbable or unsatisfactory" that there is reasonable doubt as to defendant's guilt. *People v. Wright*, 2017 IL 119561, ¶ 70.

¶ 30    To prove that defendant committed the offense of aggravated battery, the State was required to show that defendant knowingly battered an emergency medical services personnel while she was performing her official duties. 720 ILCS 5/12-3.05(d)(5)(i) (West 2018). Proving the predicate battery required showing that defendant knowingly, without legal justification, by any means, caused bodily injury to another.[3] 720 ILCS 5/12-3(a) (West 2018); see *People v. Slabon*, 2018 IL App (1st) 150149, ¶ 34.

¶ 31    Knowledge is a question of fact for the trier of fact to decide. *People v. Frazier*, 2016 IL App (1st) 140911, ¶ 23. A defendant acts knowingly when he is aware that his conduct, or the circumstances of his conduct, will result in the conduct described in the statute of the offense. 720 ILCS 5/4-5(a) (West 2018) (*i.e.*, caused bodily injury to McDermott and DeJesus). Knowledge is rarely shown by direct evidence and is usually established by circumstantial evidence, including inferences from the surrounding facts and circumstances. *Slabon*, 2018 IL App (1st) 150149, ¶ 35.

¶ 32    Viewing the evidence in the light most favorable to the State, the jury's finding that defendant knew that McDermott and DeJesus were performing their official duties as EMTs at the

---

[3] Defendant does not dispute battering McDermott and DeJesus.

time of the offense was not unreasonable. At the hospital, DeJesus and McDermott introduced themselves and informed defendant that he was being transported to another medical facility. Defendant followed the nurse's directions while being transferred from his bed to the stretcher. He was strapped to the stretcher, moved through the hospital, and loaded into a clearly marked "ambulance," fully stocked with medical supplies and equipment. Although defendant was under a sheet while on the stretcher, he briefly removed the sheet from his face while being loaded into the ambulance, providing an opportunity for him to see he was being placed in an ambulance. Tellingly, he told the nurse not to disclose his personal information before being loaded into the ambulance.

¶ 33    While inside the ambulance, defendant again took his head out from under the sheet. This provided him another opportunity to see that he was being transported in an ambulance stocked with medical supplies. He also had the opportunity to see he was in an ambulance when he unbuckled the restraints, got up from the stretcher, and began battering McDermott in the back of the vehicle. Finally, defendant was presumably able to see the vehicle was marked "ambulance" when he exited, walked around the vehicle, and reentered the ambulance. The totality of defendant's actions and the surrounding circumstances support a reasonable inference that he knew McDermott and DeJesus were EMTs performing their official duties at the time of the offense. See *People v. Thomas*, 2019 IL App (1st) 162791, ¶ 27 (knowledge may be inferred from the defendant's actions and conduct).

¶ 34    Defendant argues that he did not know that McDermott and DeJesus were EMTs because he was a psychiatric patient, drowsy from medication, and asleep when the transport was initiated. However, defendant was able to follow directions when being moved from the hospital bed to the

stretcher and coherent enough to instruct the nurse not to disclose his personal information while being loaded into the ambulance. In addition, defendant was alert enough to order DeJesus to drop her phone and walk around the ambulance testing the doors, before reentering the ambulance to retrieve his belongings. See *Slabon*, 2018 IL App (1st) 150149, ¶¶ 35-37 (where, despite defendant's altered mental state, the circumstantial evidence established that he was capable of forming the requisite knowledge to recognize he kicked a nurse).

¶ 35    In addition, the only evidence that medication was administered to defendant that evening was DeJesus's testimony that the nurse had given defendant "a pill so he was tired." McDermott was not told defendant was medicated and saw no indication of medication in reviewing the paperwork. Although the nurse indicated he had a sedative to use if necessary, there is no evidence that a sedative was administered while McDermott and DeJesus were at the hospital. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009) (it is the trier of fact's responsibility to weigh and resolve any inconsistencies in the evidence).

¶ 36    Although defendant argues that he made no admissions that he knew that McDermott and DeJesus were EMTs, it is well-established that direct evidence is not required to establish knowledge. See *Slabon*, 2018 IL App (1st) 150149, ¶ 35 (knowledge is usually established by circumstantial evidence). Defendant also argues that the testimony of McDermott and DeJesus was impeached by prior inconsistent statements and that McDermott's pending lawsuit against the hospital provided a motive for them to testify falsely. However, DeJesus was not a party in McDermott's lawsuit, and nothing in the record suggests that DeJesus stood to benefit from the outcome of that action.

¶ 37    The testimony of a single witness "is sufficient to convict if the testimony is positive and credible." *Gray*, 2017 IL 120958, ¶ 36.   After reviewing the entire record in the light most favorable to the State, we hold that the evidence was sufficient to find defendant guilty beyond a reasonable doubt.

¶ 38    Defendant next argues that the court violated Rule 431(b) during *voir dire* by failing to properly inquire whether the prospective jurors understood and accepted each of the four Rule 431(b) principles, and by using vague and ambiguous language in explaining the fourth principle.

¶ 39    Defendant acknowledges failing to preserve this issue by objecting during *voir dire* and raising the issue in his posttrial motion. *People v. Belknap*, 2014 IL 117094, ¶ 47. He nevertheless seeks review under the first-prong of plain error contending the evidence was closely balanced. See *People v. Birge*, 2021 IL 125644, ¶ 24 (stating that a trial court's violation of Rule 431(b) "is not a second-prong, structural error that requires automatic reversal under a plain-error analysis").

¶ 40    Under the plain-error doctrine, forfeited errors may be reviewed when a clear and obvious error occurred and (1) the evidence was closely balanced such that "the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the error was "so serious that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.* ¶ 48. To prevail under either prong, the defendant must first show that actual error occurred. *People v. Mudd*, 2022 IL 126830, ¶ 22. Without an error, there can be no plain error. *People v. Hood*, 2016 IL 118581, ¶ 18. The first step in a plain-error analysis is to determine if a clear or obvious error occurred. *People v. Reese*, 2017 IL 120011, ¶ 60.

¶ 41    Rule 431(b) codifies the supreme court's decision in *People v. Zehr*, 103 Ill. 2d 472 (1984), regarding admonishments to a venire during *voir dire*. Under Rule 431(b), "the court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 413(b) (eff. July 1, 2012).

¶ 42    Rule 431(b) "mandates a specific question and response process," *i.e.* the court must ask each potential juror if he or she both understands and accepts each of the four principles enumerated by the rule. *Birge*, 2021 IL 125644, ¶ 33. The court may question potential jurors as a group or individually, so long as each prospective juror is given the opportunity to respond as to their understanding and acceptance of those principles. *Id.* Rule 431(b) does not require that the court explain the principles in a specific fashion. *Id.* at ¶ 34. A court complies with Rule 431(b) if it (1) instructs the prospective jurors on the four principles, (2) asks prospective jurors if they understand the principles, and (3) asks prospective jurors if they accept the principles. *Id*. We review alleged violations of Rule 431(b) *de novo. People v. Rodriguez*, 2022 IL App (1st) 200315, ¶ 134.

¶ 43    In this case, the court addressed the venire as a group in instructing the prospective jurors on each of the four Rule 431(b) principles. The court recited each of these principles separately. After reciting each principle, the court asked the potential jurors to raise their hand if there was anyone who "does not accept nor understand" the principle.[4] The record reflects that the trial court provided each potential juror the opportunity to respond regarding whether they understood and accepted each principle.

---

[4] The specific language the trial court used varied slightly but, in each inquiry, the court consistently used the terms "not," "nor," "accept," and "understand."

¶ 44    Defendant argues that the prospective jurors could have misinterpreted the court's questions based on the use of the words "not" and "nor" and asserts that either acceptance *or* understanding, and not both, were required. We disagree. The trial court asked the jurors to raise their hands if they did "not" understand "nor" accept the principles. This is substantively no different than asking them to raise their hands if they did not both understand "and" accept any of the Rule 431(b) principles. See *People v. Lilly*, 2018 IL App (3d) 150855, ¶ 15 ("It would be imprudent to find error based solely upon the syntactical structure of a circuit court's questions"). Under either verbiage, the veniremembers knew to raise their hand if they did not both understand and accept any of the Rule 431(b) principles.

¶ 45    Posing the question to the venire in the negative by use of the word "not" at the beginning of the inquiry does not violate Rule 431(b) or create confusion. In *Lilly*, 2018 IL App (3d) 150855, ¶ 15, this court noted, by way of example, that asking " 'does any member of the venire not understand and accept those principles?' " posed the question in the negative, but still complied with Rule 431(b). Here, the court asked essentially the same question. The intent of the court's question—whether all potential jurors understood and accepted the principles—was clear, and the jurors were provided with an opportunity to respond to the court's inquiry. Therefore, the trial court's admonishments complied with the requirements of Rule 431(b).

¶ 46    Defendant also argues that the trial court used vague and confusing language in discussing the fourth principle. The court first informed the venire that "anybody placed on trial in a criminal case has a constitutional right to take the witness stand and testify on their own behalf, and if [defendant] decides to do that, you have to judge his testimony like you would any other witness." The court then continued, "If you look at this as a constitutional coin and turned it over, anybody

placed on trial in a criminal case has a constitutional right not to testify. And if [defendant] decides not to testify, no inference whatsoever can be *gained* from his silence." (Emphasis added.). According to defendant, the court's phrasing was "vague" and did not explain exactly what was to be *gained* and by whom.

¶ 47    Rule 431(b) (eff. July 1, 2012) requires the court to admonish the potential jurors "that if a defendant does not testify it cannot be held against him or her." In context, we find the court's meaning is clear—that the jury must not make any inferences based on defendant's decision whether to testify, *i.e.* they may not hold his choice not to testify against him. The court's explanation of the fourth principle imparted the purpose of the rule and adhered to the requirements of Rule 431(b).

¶ 48    As the trial court complied with the requirements of Rule 431(b), there was no error. Because there was no error, there can be no plain error and we need not address defendant's argument that the evidence was closely balanced under the first prong of the plain-error analysis. *Birge*, 2021 IL 125644, ¶ 42.

¶ 49    For the aforementioned reasons, we affirm the judgment of the circuit court.

¶ 50    Affirmed.