2020 IL App (1st) 180013-U
Order filed: March 16, 2020

FIRST DISTRICT
FIFTH DIVISION

No. 1-18-0013

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 4936 |
| | ) | |
| HERIANCE TURMAN, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Hoffman and Justice Delort concurred in the judgment.

**ORDER**

¶ 1     *Held*:     Defendant's conviction for attempted murder is affirmed, where: (1) the evidence introduced at trial was sufficient for the jury to find that defendant acted with the intent to kill, and (2) trial counsel was not ineffective for failing to introduce evidence of defendant's voluntary intoxication.

¶ 2     A jury convicted defendant, Heriance Turman, of attempted murder and two counts of aggravated battery. The trial court found that the aggravated battery counts merged into the conviction for attempted murder and sentenced defendant to 22 years' imprisonment. On appeal, defendant contends: (1) the State's evidence was not sufficient to prove beyond a reasonable doubt his specific intent to kill, as is required to sustain a conviction for attempted murder; and (2) he was denied his right to effective assistance of counsel, where his trial counsel failed to introduce

evidence of his intoxication at the time of the incident in order to show that defendant lacked the specific intent to kill. For the following reasons, we affirm.[1]

¶ 3                I. BACKGROUND

¶ 4    Defendant was charged by indictment with attempted first degree murder and multiple counts of aggravated battery with respect to an incident involving Edward Morrison. The matter proceeded to a jury trial in July 2017.

¶ 5    Mr. Morrison testified at trial that in March 2016, he worked as a police officer for Indiana University Northwest and had recently begun a part-time job, working as a security guard for Fidei Group with his uncle. Fidei Group assigned Mr. Morrison to an automobile impound lot located at 10303 South Doty Avenue (Doty), owned by the city of Chicago. The City contracted the towing services for Doty to United Road Towing, Inc. (URTI). The lot was filled with thousands of vehicles. To enter or leave the lot, a person had to drive to the front gate on Doty Avenue where a URTI employee would open the gate to allow access. The main office was located in a trailer near the front gate.

¶ 6    During night shifts, three URTI employees and one Fidei Group security guard staffed the lot; each company had its own uniform. URTI assigned each employee to occupy the office, control the front gate, or operate a forklift. The security guard was assigned to check in at the office upon reporting for duty, to drive around the lot in a vehicle provided by Fidei Group, to make an hourly check of the office lobby, and to make sure that the site was clear.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order stating with specificity why no substantial question is presented.

¶ 7       When at Doty, Mr. Morrison drove a black truck with the Fidei Group logo on the side and amber lights. The vehicle came equipped with a company telephone. Mr. Morrison also had a radio to communicate with the URTI employees.

¶ 8       On March 6, 2016, Mr. Morrison, having only worked five or six shifts at Doty, took his uncle's shift, set to begin at 6 p.m. and end at 6 a.m. the following day. When Mr. Morrison arrived, he checked in at the front office, drove the Fidei truck around the lot, and identified URTI employees by their uniforms.

¶ 9       Around 1:00 a.m. on March 7, Mr. Morrison stopped his vehicle at a high point where he was able to overlook much of the lot. A green minivan used by URTI employees pulled up next to Mr. Morrison. Defendant, wearing a URTI uniform, exited the van and approached the driver's side of Mr. Morrison's vehicle.

¶ 10      Mr. Morrison rolled his window down and had a brief conversation with defendant. Defendant asked Mr. Morrison for a favor. Before Mr. Morrison could check to see if his vehicle was in park, defendant reached through the window and attacked Mr. Morrison. At first, Mr. Morrison thought defendant was punching him in the face, but then felt a stinging pain and guessed defendant was using a knife. Mr. Morrison was stabbed seven to eight times, sustaining injuries to his face, ear, head, arm, and shoulder. Mr. Morrison pleaded for defendant to stop, but defendant continued. When Mr. Morrison tried to use his radio to call for help, defendant grabbed it.

¶ 11      Mr. Morrison put his car into drive and drove toward the office. Defendant held on to the car, but eventually let go. Mr. Morrison arrived at the office, asked for help, and pulled out his gun. Defendant never entered the office.

¶ 12    Mr. Morrison's vehicle contained recording equipment which was running at the time of the attack. A video clip from the recording was published to the jury. Mr. Morrison described his truck and the attack as it was depicted on the video.

¶ 13    The impound lot also had surveillance cameras. A video clip of defendant's attack on Mr. Morrison from the camera just outside the office was published to the jury. His vehicle can be seen driving up to the office and Mr. Morrison can be seen exiting the vehicle and running into the office. A video clip from the camera just inside the office was also published to the jury. Defendant can be seen inside the office before the stabbing. Photos of Mr. Morrison's vehicle, the office area to where he retreated, and defendant's vehicle were admitted into evidence and published to the jury.

¶ 14    An ambulance arrived and took Mr. Morrison to Christ Hospital where he received stitches to his face and staples to his head. He was discharged that same day. He later chose to have his stitches redone by a plastic surgeon. His face, head, and arm were permanently scarred. The police took photographs of Mr. Morrison's injuries, which were admitted into evidence and published to the jury. Mr. Morrison testified that he attended physical therapy three times a week for four weeks to heal his arm injury, had suffered psychological damage, and was off of work for three months.

¶ 15    Charles Craft testified that at the time of the incident, he had worked for URTI for fifteen years. He wore a URTI uniform, a dark grey jumpsuit with reflective stripes around the legs and arms. During his time, he became familiar with the other URTI employees. He and defendant had worked together for five or six years.

¶ 16    Mr. Craft worked the same shift as defendant on March 6 and 7. Mr. Craft saw defendant in the office trailer just before their shift started at 11:30 p.m. Defendant was dressed in a URTI uniform and a hoodie. Mr. Craft identified defendant on the video from the camera inside of the

office. During his shift, Mr. Craft worked the front gate. He was responsible for physically opening the gate for the tow trucks and customers. That night, defendant drove around the lot in a "yard car," which was a green van.

¶ 17    Shortly after 1:00 a.m., Mr. Craft opened the front gate for a tow truck driver. The green van came speeding up and exited onto Doty Avenue behind the tow truck. Employees were not allowed to drive the impounded vehicles off the lot. Mr. Craft could not see who was driving. Mr. Craft did not immediately report what he saw. Cameron Bowman, the URTI employee assigned to the forklift, approached Mr. Craft and they spoke about the green van. Mr. Craft returned to the office, but defendant was not there.

¶ 18    A video clip from the tow yard surveillance camera near the front gate was shown to the jury. Mr. Craft was seen in the video opening the gate for a tow truck. The van can be seen exiting behind the tow truck.

¶ 19    Chicago Police Detective Henry Barsch testified that in March 2016, he assisted Detective Roxana Hopps with an investigation regarding a stabbing. Detective Barsch ultimately returned to his headquarters and was present when defendant arrived at the station on his own. An evidence technician took defendant's clothing which included a black hooded sweatshirt, a shirt, and pants. Defendant cooperated.

¶ 20    Chicago Police Officer Jamie Bravo testified that on March 9, 2016, he responded to a call at Doty. There, Officer Bravo met another officer standing next to a box cutter. Officer Bravo stayed with the box cutter until Officer Angelo Marconi, an evidence technician at the time, photographed and inventoried the box cutter. Officer Bravo identified photographs of the box cutter and the area where it was found. The photographs were admitted into evidence and published

to the jury. Officer Bravo also identified the box cutter and demonstrated how one would produce the box cutter's blade.

¶ 21    Chicago Police Officer Jerry Doskocz[2] testified that on March 7, 2016, he was working as an evidence technician. Detective Hopps gave him a black stocking cap, a black hooded sweatshirt, a black t-shirt, a black and gray belt, Timberland boots, a white tank top, dark gray and orange stripped work pants, and a light gray and orange striped work shirt with a URTI patch. Officer Doskozz packaged and inventoried the clothing, which he later identified in court.

¶ 22    Detective Hopps testified that, on March 7, 2016, she was assigned to investigate a stabbing at an impound lot located at 10301 South Doty Avenue. At Doty, Mr. Morrison was being treated for his injuries in the back of an ambulance. Detective Hops spoke to Mr. Morrison briefly and learned that he had sustained several stab wounds to his head and body. Mr. Morrison's face was completely bandaged.

¶ 23    The parties stipulated that Cook County State's Attorney Investigator Mary Ember would testify that she collected and inventoried a buccal swab from defendant.

¶ 24    The parties stipulated that Veronica Jackson, an expert in the field of forensic biology, would testify that when she received the box cutter, she swabbed the knife, handle, and trigger for possible cellular material and future DNA analysis. Ms. Jackson also examined a black knit hat, a hooded sweatshirt, a black t-shirt, a belt, boots, an undershirt, work pants, and a work shirt. She did not find blood-like stains.

---

[2] The witness list names an Officer Doskocz, but the trial testimony refers to an "Officer Doskozz."

¶ 25    The parties stipulated that Youngfei Wu, an expert in the field of DNA analysis, would testify that he received the swabs from the box cutter and defendant's buccal swap. He opined that there was insufficient human DNA on the swabs from the box cutter for DNA analysis.

¶ 26    The State rested. The court denied the defendant's motion for directed finding, and the defense rested without introducing evidence.

¶ 27    In closing argument, defense counsel argued that the State failed to prove defendant had the intent to kill because defendant used a box cutter, not a knife, and the victim's injuries were not critical. The jury found defendant guilty of attempted first degree murder, aggravated battery causing permanent disfigurement, and aggravated battery with a deadly weapon.

¶ 28    During trial, defendant was represented by the Office of the Cook County Public Defender. After his conviction, defendant retained a new attorney who then filed a motion for a new trial. Therein, defendant's new counsel alleged that trial counsel were ineffective for failing to introduce evidence then known to them indicating that, at the time of the incident, defendant was suffering from an addiction to Phencyclidine (PCP), thus negating the element of specific intent. Specifically, the motion alleged:

"2.    The [public defenders] who represented [defendant] did not present any evidence that [defendant] lacked the intent to kill because he was suffering a delusional episode because he was under the influence of [PCP], *** a dissociative drug. PCP was brought to market in the 1950s as an anesthetic pharmaceutical drug but was taken off the market in 1965 due to the high prevalence of dissociative hallucinogenic side effects. *** Like many other drugs, PCP has been known to alter mood states in an unpredictable fashion, causing some individuals to become detached, and others to become animated. PCP may induce feelings of strength, power, and invulnerability as well as a numbing effect on the mind.

> Because of [*sic*] his prior attorneys failed to present this evidence to the jury prior counsels' representation fell below the standard of reasonableness such that it affected the result of the trial in this case and secondly the defendant was prejudiced by this conduct by his prior attorneys. The jury could have been advised that [defendant] was not there lying in wait ready to attack Mr. Morrison because he was suffering from a drug induced delusion. The two men had never met before and Mr. Morrison and [defendant] did not have any grudges towards each other."

Defendant attached sixteen pages of medical records in support of his allegation. These medical records revealed that in the afternoon hours of the day of the incident, defendant went to the hospital and was exhibiting symptoms of withdrawal from PCP.

¶ 29     At the hearing on the motion for a new trial, defendant's new counsel argued that the State failed to prove defendant had the intent to kill because defendant only used a box cutter, Mr. Morrison only thought he was being punched, and the Mr. Morrison's injuries were not life-threatening. Further, the defendant could not have had the intent to kill because at the time of arrest, there was medical documentation showing that defendant "was suffering from PCP usage and/or withdrawal." The court asked if defense counsel was "talking about voluntary intoxication," and defense counsel responded that it was likely that it was voluntary intoxication. Defense counsel acknowledged that voluntary intoxication was not a defense in Illinois but argued that if the jury had known about defendant's altered state, "acutely out of his mind," it could not have found that defendant acted intentionally. Defense counsel indicated he was not arguing that defendant was insane.

¶ 30    Defense counsel also acknowledged that he had spoken with trial counsel about their decision not to utilize evidence of defendant's state of intoxication. Defense counsel stressed that "it was essential that the jurors know about [defendant's intoxication]."

¶ 31    The State stressed that defendant's visit to the hospital took place 12 hours after the attack. The State argued that this evidence therefore did not establish that defendant had PCP in his system at the time of the attack.

¶ 32    The circuit court ruled that while defendant's intoxication might be a factor in mitigation at sentencing, it was not relevant to the question of whether defendant had the intent to kill. The court denied the motion for new trial, stating that he would not second-guess trial counsel's strategy.

¶ 33    After a sentencing hearing, the court merged the aggravated battery convictions with the attempted first degree murder conviction and sentenced defendant to 22 years' imprisonment. Defendant's motion to reconsider his sentence was denied. Defendant timely appealed.

¶ 34                                    II. ANALYSIS

¶ 35    On appeal, defendant first contends that his attempted murder conviction should be vacated because the State failed to prove that he had the specific intent to kill Mr. Morrison. Defendant highlights that he did not know Mr. Morrison, never expressed an intention to kill him, Mr. Morrison's injuries were not life threatening, and defendant wielded a box cutter instead of a more impactful weapon.

¶ 36    The State has the burden of proving each element of a criminal offense beyond a reasonable doubt. *People v. Brown*, 2015 IL App (1st) 131873, ¶ 12 (citing *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009)). In determining whether there was sufficient evidence, we construe all of the evidence in the light most favorable to the State and determine whether any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt. *Id.* In a jury trial, the jury's credibility determinations are entitled to great weight. *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). We will not overturn a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Brown*, 2015 IL App (1st) 131873, ¶ 12 (citing *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 37 A person commits attempted first degree murder when, acting with the intent to kill, he completes an act which constitutes a substantial step toward the commission of first degree murder. 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2014). Here, defendant challenges only the sufficiency of the evidence as to the element of intent.

¶ 38 Defendant's intent to kill may be inferred from surrounding circumstances, such as the character of the attack, the use of a deadly weapon, or the nature and extent of the victim's injuries. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 59. " 'Such intent may be inferred when it has been demonstrated that the defendant voluntarily and willingly committed an act, the natural tendency of which is to destroy another's life.' " *People v. Green,* 339 Ill. App. 3d 443, 451 (2003) (quoting *People v. Winters*, 151 Ill. App. 3d 402, 405 (1986)). Evidence of intent to inflict great bodily harm is insufficient. *People v. Jones*, 184 Ill. App. 3d 412, 430 (1989). Whether defendant had an intent to kill is a determination for the trier of fact, and that finding will not be disturbed on appeal unless there is reasonable doubt as to defendant's guilt. *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 39.

¶ 39 Here, defendant attacked Mr. Morrison as Mr. Morrison sat defenseless and trapped inside of his truck. Through the driver's side window of the truck, defendant grabbed Mr. Morrison by the arm and vest, pulled him closer, and stabbed him with a box cutter seven to eight times in the

face, head, ear, arm, and shoulder. Viewed in light most favorable to the State, this evidence was strong evidence permitting the jury to find that defendant had the specific intent to kill.

¶ 40    In addition, other circumstances surrounding the incident further demonstrated defendant's intent to kill. Defendant continued to attack while Mr. Morrison was pleading for him to stop. Defendant prevented Mr. Morrison from calling for help when he took Mr. Morrison's radio. Defendant even held on to Mr. Morrison's truck after Mr. Morrison eventually put his truck into drive and drove to the office. After defendant fell off the truck, he fled the scene in a vehicle he was not authorized to drive outside of the lot.

¶ 41    Nevertheless, defendant argues that the surrounding circumstances in this case contradict the conclusion that he acted with the intent to kill. Defendant notes that he did not have a motive to kill Mr. Morrison and chose to use a box cutter instead of a more impactful weapon.

¶ 42    As to motive, defendant argues that prior to the incident he did not know, threaten, or have a quarrel with Mr. Morrison. However, the State was not required to establish a motive to sustain a conviction for attempted murder. *People v. Furdge*, 332 Ill. App. 3d 1019, 1023 (2002). Although defendant did not directly express an intent to kill Mr. Morrison, the surrounding circumstances show that he deliberately approached Mr. Morrison, continuously stabbed Mr. Morrison despite pleas to stop, and showed no signs of letting up on the attack until Mr. Morrison drove off and defendant was no longer able to hold on to the moving truck. The jury could reasonably have found this evidence of intent to kill.

¶ 43    Defendant further contends that his use of a box cutter as opposed to some other weapon, along with Mr. Morrison's non-life threatening wounds, proves that he acted with at most an intent to commit bodily harm or disfigurement, which is not sufficient to prove intent to kill. *People v. Nuno*, 206 Ill. App. 3d 163, 165 (1990). Defendant argues that the blade he used was short and

thin and not likely to be life threatening, while nevertheless conceding on appeal that it could inflict a fatal injury. According to defendant, Mr. Morrison only suffered unpleasant and superficial wounds that were treated at the hospital within hours, proving that defendant only wielded the box cutter with the intent to commit bodily harm.

¶ 44    However, the evidence demonstrates that defendant used the box cutter in a deadly manner. Whether or not the injuries sustained by Mr. Morrison were life-threatening is irrelevant to defendant's state of mind, if defendant had no way of knowing the actual severity at the time. See *People v. Scott*, 271 Ill. App. 3d 307, 211 (1994) (the use of bare hands can be considered a deadly weapon so as to support a finding of specific intent to kill). Here, defendant sliced and stabbed Mr. Morrison about the face, ear, head, arm, and shoulder, places that had great potential to cause death. Defendant sliced open Mr. Morrison's face from the lower orbital bone to and through his lip, causing a deep, penetrating, and gaping wound. Mr. Morrison needed stiches for his face and staples for his head. Using a box cutter to this extent, with no signs of stopping until Mr. Morrison escaped, clearly shows that the jury could reasonably find that the defendant had the intent to kill Mr. Morrison.

¶ 45    In sum, we find that the evidence in this case, including the character of the defendant's assault on Mr. Morrison, his use of a deadly weapon, and the nature and extent of Mr. Morrison's injuries, was sufficient to permit the jury to conclude that defendant had the specific intent to kill Mr. Morrison. *Carlisle*, 2015 IL App (1st) 131144, ¶ 49. Accordingly, we will not disturb the jury's finding that defendant possessed the required intent and reject defendant's contention that the State failed to prove beyond a reasonable doubt that defendant committed the offense of attempted first degree murder.

¶ 46    Defendant next argues that the trial court erred when it denied defendant's motion for new trial based on his assertions of ineffective assistance of counsel. Defendant contends his trial counsel were ineffective for failing to introduce evidence of defendant's voluntary intoxication, which would have established that defendant lacked the intent to kill Mr. Morrison.

¶ 47    To establish a claim of ineffective assistance of counsel, a defendant must show that: (1) his attorney's representation fell below an objective standard of reasonableness, and (2) he was prejudiced by this deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Effective assistance means competent, not perfect representation. *Palmer*, 162 Ill. 2d 479-80. There is a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance and not of incompetence. *People v. Coleman*, 183 Ill. 2d 366, 397 (1998). In addition, our supreme court has held that "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill.2d 122, 135 (2008). A defendant has the burden of establishing any such prejudice. *People v. Glenn*, 363 Ill.App.3d 170, 173 (2006). Failure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim. *People v. Palmer,* 162 Ill. 2d 465, 476-76 (1994).

¶ 48    With respect to the first prong, defendant argues that trial counsels' failure to introduce the available medical evidence of his addiction to PCP to show that he lacked the intent to kill "was an abdication, not an exercise, of trial strategy." We disagree.

¶ 49    Historically, Illinois recognized voluntary intoxication as an affirmative defense. See 720 ILCS 5/6-3 (West 2000) ("A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition either: (a) Is so extreme as to suspend the power of reason and render him incapable of forming a specific intent which is an element of the offense; or (b) Is involuntarily produced and deprives him of substantial capacity either to appreciate the

criminality of his conduct or to conform his conduct to the requirements of law."). However, the statute was amended in 2002 to eliminate the affirmative defense of voluntary intoxication. See 720 ILCS 5/6-3 (West 2004) (containing operative, revised provision stating only that a "person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."). In light of this amendment, it was recognized that "Illinois no longer recognized voluntary intoxication as an excuse for criminal conduct." *People v. Jackson*, 362 Ill. App. 3d 1196, 1201 (2006).

¶ 50    This was the legal framework presented to trial counsel during the 2017 jury trial in this matter. Nevertheless, on appeal defendant contends that trial counsel should have nevertheless introduced evidence of his addiction to PCP in light of this court's 2018 decision in *People v. Slabon*, 2018 IL App (1st) 150149. In that case, the court held that while voluntary intoxication may no longer be available under the statute, "a person's state of voluntary intoxication may be relevant in the commission of specific intent crimes *** to negate that specific intent, even if it does not provide an affirmative defense against his criminal conduct." *Id*. at 33. Thus, defendant specifically contends trial counsel should have introduced the medical records to negate the State's evidence of specific intent, and their failure to do so was unreasonable.

¶ 51    We disagree. As noted above, it was generally understood prior to the decision in *Slabon* that "Illinois no longer recognized voluntary intoxication as an excuse for criminal conduct." *Jackson*, 362 Ill. App. 3d at 1201. We decline to fault trial counsel for failing to raise an alternative argument not recognized by this court until the year after defendant's jury trial. *Id*. ("It was not incompetence to refrain from asserting a defense that the law clearly negated.").

¶ 52    Moreover, even accepting the distinction defendant and the *Slabon* decision draws between raising an unavailable defense of voluntary intoxication and using such evidence to negate the State's evidence of specific intent, an element of the offense, we find that defendant has failed to establish actual prejudice. The medical records defendant claims should have been introduced at trial indicated that defendant exhibited symptoms of PCP withdrawal more than 12 hours after the incident, and after the defendant exhibited calm and cooperative behavior at the police station. The assertion that this evidence somehow establishes that defendant was so intoxicated at the time of the incident such that he lacked the specific intent to kill is entirely speculative, and as such defendant has failed to meet his burden to establish actual prejudice. *Supra* ¶ 47.

¶ 53                            III. CONCLUSION

¶ 54    For the foregoing reasons, the judgement of the circuit court is affirmed.

¶ 55    Affirmed.