2020 IL App (1st) 172497-U

No. 1-17-2497

Order filed July 22, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 4005 |
| | ) | |
| THOMAS THOMPSON, | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MCBRIDE delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's convictions for attempted first degree murder are affirmed, where: (1) the trial court did not fail to consider the crux of his defense during judgment; and (2) the trial court conducted a proper inquiry into defendant's *pro se* ineffective assistance of counsel claims.

¶ 2    Following a bench trial, defendant Thomas Thompson was convicted of two counts of attempted murder of a peace officer (720 ILCS 5/8-4(a) (West 2014); 720 ILCS 5/9-1(b)(1) (West 2014)) and possession of a controlled substance (720 ILCS 570/402(c) (West 2014)). He was

sentenced to two 24-year terms of imprisonment and one 2-year term, to be served concurrently. On appeal, defendant argues (1) his convictions should be reversed because the trial court did not remember or consider the crux of his defense when entering judgment against him, thereby denying him a fair trial; and (2) the court should remand the case for a new *Krankel* hearing where the trial court did not appoint a new attorney for defendant to present his claims of ineffective assistance of counsel even though his claims established possible neglect. We affirm.

¶ 3   Defendant was charged with 30 counts, arising from events which took place on February 14, 2015. At trial, the State proceeded on four counts of attempt murder, four counts of aggravated discharge of a firearm, one count of disarming a peace officer, and one count of possession of a controlled substance.[1]

¶ 4   Raymond Robinson testified that on February 14, 2015, he was working as an assistant manager at a Walgreen's store on North Clark Street in Chicago. Robinson described the store as "at least a city block long" with "pretty good" lighting in its parking lot. At approximately 7:30 p.m., he saw a man, whom he identified in court as defendant, in "the vitamin, diet aid supplement aisle" where defendant asked him about fish oil vitamins. Robinson next saw defendant, with merchandise in both hands, pass the registers and exit the store without paying. As defendant passed the first door, Robinson told him he needed to pay for the merchandise, but defendant fully exited the store, and Robinson followed him into the parking lot.

¶ 5   In the Walgreen's parking lot, Robinson noticed a marked squad car and waved for the police officers inside of the car to come to him. The officers, Officer Czapla and Officer Groh,

---

[1] The State also went to trial on two counts of aggravated battery but, at sentencing, informed the court it had intended to *nolle pros* those counts.

exited their vehicle and walked over to Robinson and defendant. Defendant was carrying a bag on his shoulder, which the officers opened. The bag contained more Walgreen's products, including nutritional supplements, vitamins, eyedrops, and High T booster. Defendant then "bolted" to get to the driver's side of a car parked "on" the wall of the store, facing out. The officers gave chase. When they caught up to defendant, he hit Czapla in the face with a "blunt fist," causing him to bleed from his face. Groh then tried to subdue defendant, who punched him "[s]everal" times in the face, while Czapla attempted to call for help on the radio. Groh was bleeding from his forehead. Robinson was approximately a car length away when defendant punched the officers. Robinson approached while calling 911.

¶ 6     The police officers continued attempting to subdue defendant, when Robinson heard defendant say, "if you would have let me go, I wouldn't have hit you." Robinson then saw defendant "get" Groh's pistol from its holster. Defendant, Groh, and Czapla "were wrestling" at that point, "went to the ground once and came back up," and Robinson then heard a gunshot. He saw the gun in defendant's hand. Defendant was "trying to point it over his shoulder at the police officers." Robinson "jumped in" and grabbed defendant's arm. He could see defendant's "finger pulling the trigger trying to shoot still over his shoulder" approximately two to three times. Robinson grabbed defendant's gun hand, pushed the gun down, and was able to take defendant's finger off the trigger. With Czapla also pushing on defendant's arm, the gun "popped out" of defendant's hand and Czapla pushed it "a few feet away." Robinson, Czapla, and Groh were still wrestling with defendant trying to subdue him, when another customer grabbed defendant by his legs and forced him to the ground, at which point they were able to restrain defendant.

¶ 7     On cross-examination, Robinson stated the Walgreen's had nine security cameras inside

the store and three cameras outside the store. Robinson called 911 after defendant punched both officers in their faces. After he concluded his phone call with 911, he saw defendant take the pistol from Groh's holster and heard the gunshot. During the struggle, the officers and defendant "went to the ground once or twice but [defendant] kept forcing himself back up." When Robinson heard the gunshot, defendant had one knee down and was crouched over, holding the gun in his right hand and pointing it over his left shoulder. When he heard the gunshot, Robinson had no idea whether anyone was struck by a bullet because "[t]here was blood everywhere." Robinson did not believe the gun was pointed "in an upwards direction" at the time he heard the shot, and saw defendant attempting to pull the trigger several more times but the gun did not fire. Robinson never heard defendant yell anything like "[t]hey are trying to kill me." Robinson had no experience with guns and did not know whether the magazine was still in the gun during the struggle.

¶ 8    Christopher Smith testified he and his wife, Beth White, were customers at the Walgreen's between 7:30 and 8:00 P.M. on February 14, 2015. When they were in the store, Smith saw a man quickly move through the double doors and exit the building with a bag over his shoulder, followed by two employees. Smith and White exited the Walgreen's into the parking lot and saw the man, whom White identified at trial as defendant, having a conversation with the employees. Smith also saw a police car parked in the lot, and waved to the two officers sitting inside, indicating that they should come. When the officers walked over, Smith and White walked back to their car, watching the scene. White got into the passenger side of their car. Smith saw defendant run to his car, which was parked near the passenger side of Smith's car and watched the resulting scuffle between defendant and the officers. At that point, another man got out of defendant's car, "kind of slinking" and walked toward Clark Street. Smith followed the other man but lost sight of him shortly, so he

returned to his car and saw the officers and defendant on the ground with the manager trying to help. As Smith "started to go in, the gunshot went off." Smith ran back to his car to check on White, and then went back to help the officers and the manager. Smith then picked defendant's feet up from under him and folded him over, pinning him.

¶ 9   On cross-examination, Smith stated his car was parked "one space away" from defendant's car, with one empty space between the cars. Smith was approximately four or five feet from the struggle when he heard the gunshot. He saw a spark but did not see who had the gun. Smith did not notice whether the magazine was still in the gun when he saw it on the ground. Smith heard defendant say "Tre, Tre, help me. Give me a hand with this." "[A] time or two," he also heard defendant say, "I'm going to kill you guys."

¶ 10   White testified she was with Smith at the Walgreen's on February 14, 2015 at 7:30 to 8:00 p.m. White testified consistently with Smith regarding seeing defendant in the store and the events that happened immediately after they exited the store. White sat in her car and saw defendant attempt to get into his car, which was facing the opposite way, with one empty parking space between the cars. She saw defendant punch Czapla in the face with a closed fist, with blood "splattering and Officer Czapla was knocked back" a couple of steps. Groh then tried to subdue defendant, but defendant kept hitting the officers with a closed fist and tried to get away from them. The passenger in defendant's car then got out and started to walk away. Smith followed him.

¶ 11   White dialed 911 to call for help as the two officers were moving toward the building, continuing to struggle to get defendant to stop. Defendant never stopped, and shouted "I am going to kill you" at the officers. Robinson went where the officers were struggling with defendant on the ground. White heard Groh say "[h]e's got my gun, someone call for help" and heard a gun go

off. She did not know where the gun was when it went off, and only heard one gunshot. She saw the four men, including her husband, attempt to subdue defendant.

¶ 12    On cross-examination, White stated that during the struggle and before she heard the yelling and the gunshot, she was in her car with the window rolled down. White believed she heard defendant yell "I'm going to kill you." White spoke with detectives about the incident, but, while she believed she told them that she heard defendant yell that he was going to kill the officers, did not recall whether she did so. White was approximately 15 or 16 feet from the struggle. The artificial lighting in the parking lot at the time was "very bright."

¶ 13    Chicago police officer Mark Czapla testified he was working with his partner, Joseph Groh in a marked police car on February 14, 2015. At 7:30 p.m., they were parked in the parking lot at the Walgreen's store on North Clark Street finishing their lunch, when Czapla saw a disturbance in the parking lot. Two Walgreen's employees were following defendant with "a lot of screaming, yelling, and such." Czapla and Groh walked toward them after the Walgreen's employees waved them over. They had a conversation with the employees. After the conversation, Czapla asked defendant to open his backpack. He saw stolen Walgreen's merchandise inside. After the employees indicated they wanted to pursue criminal charges and Czapla told defendant he was under arrest, defendant said "something to the effect of the f*** I am" and ran away toward a row of parked cars in the lot. Czapla and Groh gave chase and caught up to defendant, at which point defendant punched Czapla "square in the jaw" from a foot or two away. The punch, which was very strong, threw Czapla back "in a big way." Czapla then grabbed his radio to call for backup.

¶ 14    During this time, Groh was "trying to get physical control of the defendant" while defendant punched him in the face and head multiple times with a closed fist. Defendant "fought

[the officers] with every second that he had." Walgreen's employee Robinson came to assist the officers. During the struggle, Groh was disarmed when defendant pulled Groh's gun from his holster. Czapla then changed his focus from trying to restrain defendant to trying to get the gun from him.

¶ 15    While they struggled for control of the gun, Czapla heard defendant say "I'm going to kill you mother******." Defendant fired the gun. Czapla did not see the gun fire but saw the gun was pointed in the officers' "general direction." Groh, Czapla, and defendant were "[i]nches away from each other" when defendant fired. Czapla then tried to pull the gun from defendant's control but was unable to do so, because defendant had both hands on the grip. Czapla pointed the gun away from them. He heard "three trigger pulls" but no shots fired. With Robinson and Smith's assistance, the officers were able to pull the gun from defendant's grip. Czapla slid the gun away from them. When other officers arrived, Czapla requested they complete the handcuffing of defendant because Czapla "didn't have the strength to do that [himself]." After defendant was arrested, the officers went to Illinois Masonic hospital to seek medical attention. Czapla received stitches in his lower lip.

¶ 16    On cross-examination, Czapla stated he did not reach for his gun during the incident, but did reach for his radio several times after being punched by defendant. Czapla saw defendant "tugging at [Groh's] holster," but did not see him take the gun from the holster. The one gunshot Czapla heard did not strike either him or Groh, but the barrel of the gun at the time was pointed toward the officers but "at a downward angle." Czapla never learned where the shell of the bullet was recovered from. Czapla heard defendant say he was going to kill them when he was holding the gun, either when he shot it or when he heard the later three trigger pulls. Czapla spoke with

detectives about the incident. He told them defendant said he would kill them "during the struggle" when he was fighting with them. In addition to stitches, Czapla received medical treatment for scrapes on his knees, elbows, and arms.

¶ 17 Chicago police officer Joseph Groh testified consistently with Czapla regarding the events leading up to the struggle between Czapla, Groh, and defendant. Defendant punched Groh "real hard" causing him to bleed profusely from the head and knocking his glasses from his face. After a brief scuffle, Groh fell to the ground, with defendant above him punching him multiple times.

¶ 18 After Groh stood up, defendant reached for Groh's duty weapon in his holster, a "level three holster which is the most secure holster available." Defendant was "grabbing at it, pulling at it." Groh put both hands on the holster using "all" his force to keep the gun holstered. He told Czapla defendant was "going for" his gun. Defendant managed to pull the gun from the holster, which created another struggle, during which defendant and the officers fell to the ground. Defendant then shot Groh's gun over his shoulder toward Groh and Czapla, who were "a few feet away" at the time. The gun was pointed at the officers when Groh saw it go off. After the gun went off, Groh heard a "click, click, click," which he recognized as three trigger pulls from his weapon. Groh noted that what saved the officers was "that the magazine [for the weapon] fell out inexplicably." Groh could not explain how that happened. After Robinson assisted the officers in taking the weapon from defendant, the officers were able to subdue defendant with help from "a good samaritan." Groh received medical treatment at the hospital for multiple lacerations, a concussion, and stitches to his head.

¶ 19 On cross-examination, Groh stated defendant punched Czapla one time, but it was "a hell of a punch." At that point, Groh stepped in to contain defendant, who punched him "at least twice,

but it did enough damage to leave [him] completely bloodied up." Those punches also caused Groh's glasses to be knocked off. Groh's uncorrected vision is poor. After a scuffle, Groh slipped and hit a pole. Defendant got on top of him and punched him "[w]herever he could hit [him]." After Groh got back on his feet, he felt defendant "tugging really heavily" at his duty weapon. He felt the straps of his holster come undone. They struggled for the gun. Czapla attempted to push defendant's wrist and arm down. Groh was trying to hold on to defendant. Groh heard one shot fired over defendant's shoulder, but his vision was greatly obscured at the time. After the one gunshot, Groh heard the "click, click, click," discovering later that the magazine had been discharged from his weapon. In order to remove the magazine from his weapon, a person would need to press a button on it, but Groh was unsure if the button was pressed intentionally or unintentionally.

¶ 20    Chicago police officer Kevin Norris, an evidence technician, went to Swedish Covenant Hospital on February 14, 2015. He took photographs of defendant, as well as Czapla and Groh. In the emergency room, Norris had a conversation with defendant. Norris asked defendant if he was injured. Defendant said that "all the blood that was covering him was from the officers."

¶ 21    Detective Michael Kennedy testified he spoke with Czapla after he was released from the hospital as a part of his investigation of the incident. Czapla told Kennedy that he recalled defendant saying "kill" at some point during the struggle, but Kennedy did not write it in his report, because it was only a summary of the interview.

¶ 22    Detective Arthur Taraszkiewicz testified that on February 14, 2015, he interviewed defendant at Swedish Convent Hospital, where he recovered a small knotted plastic bag containing white powder from the ground next to defendant's gurney. Defendant told Taraszkiewicz it was

cocaine he was holding for somebody else, and he believed the narcotics to be "molly." Regarding the incident at the Walgreen's, defendant told Taraszkiewicz that he made the decision to take the officer's gun because "the officers were armed and he wasn't." Defendant stated that after taking the gun and during the struggle, his finger was on the trigger the entire time.

¶ 23    At a subsequent interview at the police station, defendant told Taraszkiewicz that Groh never went for his gun to pull it out, and only attempted to protect it from being taken by defendant. Defendant also stated he had experience with weapons because he was in the military, only his finger was on the trigger, and he "knowing and deliberately fired the gun." Defendant told Taraszkiewicz the bullet struck the pavement, and he pulled the trigger several more times, but the gun did not fire. He thought it was jammed. Defendant also made "bragging comments" about how hard he hit Czapla and stated, "officers from the north side couldn't fight."

¶ 24    On cross-examination, Taraszkiewicz stated he did not record defendant's statements at the hospital and police station and did not give defendant the opportunity to write out his statement. Taraszkiewicz clarified that defendant did not use the words "knowingly and deliberately" but rather that was his own summary of what defendant told him at the police station, which was that he knew he pulled the trigger and it was not an accident.

¶ 25    Officer Brian Humphrey testified that he recovered a nine-millimeter revolver from the scene and gave it to his supervisor. On cross-examination, Humphrey stated the fight was still ongoing when he arrived at the scene, and he grabbed the weapon during that time. The weapon was "[w]ithin arm's reach" of Groh at the time. At the time Humphrey recovered the gun, he did not see any magazine and did not know the magazine had dropped.

¶ 26    Chicago police sergeant Dean Barney testified he received the gun from Humphrey and

secured it in the back of Humphrey's squad car. Barney also recovered a magazine from the weapon laying approximately ten feet from the officers and defendant. Barney inventoried the gun and magazine. Chicago police evidence specialist Gerald Poradzisz testified regarding photographs taken of the scene and a weapon, magazine and cartridges recovered and inventoried.

¶ 27    The State submitted multiple exhibits into evidence, including 52 photographs depicting the scene of the incident, clothing worn by the police officers, and photographs of the officers' injuries, as well as surveillance videos from the Walgreen's for the time of the incident.[2] The surveillance videos depict various angles inside and outside the Walgreen's store and parking lot. The videos show a man, wearing a messenger bag slung across his back, exit the store carrying merchandise in his hands, the same man confronted by police officers and store personnel in the parking lot, and an ensuing struggle. The surveillance video of the parking lot depicts the man wrestling with the officers, one of whom is visibly bleeding heavily from a facial laceration, before pulling a gun from that officer's holster. The officers and man are seen struggling over control of the gun until the man is subdued with the assistance of two additional people in the parking lot.

¶ 28    The parties stipulated that, if called to testify, Cathy Regan would testify that she is a forensic scientist who tested the suspect narcotics and found it to be methylenedioxyamphetamine, also known as MDMA.

¶ 29    Defendant testified that he served in the army from September 1999 to October 2002 as a military police officer. He received weapons training as a part of his duties. In October 2007, defendant was diagnosed with bipolar disorder, which had been difficult for him to manage. He

_____

[2] While the exhibits incorporated into the record on review contain 51 photographs, the impounding order states 52 photographs were entered into evidence.

had been taking lithium carbonate to manage the disorder since May 2014. Defendant also had issues with drug and alcohol use since he was 13 years old. He relapsed in November 2014.

¶ 30    From February 13 through February 14, 2015, defendant went to several parties, drank multiple alcoholic beverages, and used drugs. He found a bag of drugs at one of the parties, and took them with him when he left. He thought it was cocaine, and used about two grams, but he later learned it was "MDA [sic] also known as Molly." He stated he had never taken Molly before. The drug made him "very anxious, wired" and he felt "very strong."

¶ 31    In the evening of February 14, 2015, defendant drove and picked up a man he knew as "Tray." They went to the Walgreen's on Clark Street. Defendant went into the store while Tray stayed in the car. During that time, one of the people who defendant had partied with called him on the phone, and threatened to kill him if he did not return the missing drugs. Defendant then went to the supplement aisle of the store for two reasons: (1) he was "very intoxicated" and wanted something "that would bring [him] down immediately so [he] could think clear"; and (2) he wanted to crush up supplements to add to the drugs in the bag he took so that it looked like he was returning the same amount he had stolen. Defendant was very scared, afraid for his life.

¶ 32    Defendant left the store without paying for the items he had grabbed. He was approached by two police officers, who asked him for identification. At one point, the officer whom he later learned to be Czapla, said "[o]h, I know you." Defendant thought the officers might have been sent to kill him and get the drugs back. When the officers attempted to place defendant under arrest, he ran to his car but it was locked. Defendant turned, and punched Czapla in the face. Czapla reached to his utility belt "as if to draw his weapon." Believing Czapla would shoot him, defendant ran. He heard Groh behind him and believed Groh might shoot him as well, so he grabbed Groh's weapon

to keep Groh from drawing it. Defendant did not intend to use Groh's weapon against him. Defendant "immediately" pressed the button on the grip which releases the magazine, trying to release the magazine while the weapon was still in the holster. Defendant did not pull the trigger at that point because, if he did, he might have shot Groh in the leg with his own gun and defendant "didn't want to do that." Once defendant had the gun out of the holster, he hoped to "clear and disable the weapon" by unloading it so that it could not be used against him. Defendant believed he heard the magazine fall on the ground, but was not certain. At that point, defendant turned and aimed the gun away from the officers toward a brick wall and pulled the trigger, not intending to aim it at the officers.

¶ 33    After defendant fired the gun once, he noticed it was "clearly disabled" because the slide was "back locked in place and the breech was open." Defendant pulled the trigger two more times. Shortly thereafter, he was subdued and handcuffed. Defendant was taken to the hospital, where he spoke with a detective regarding the incident, after which he was taken to the police station. At the station, the officers asked him to make a recorded or written statement. Defendant refused, but did answer a few of their questions until he had "a disagreement with the state's attorney." While at the Walgreen's, defendant did not intend to fire in the direction of any of the officers, and did not intend to kill either of them.

¶ 34    On cross-examination, defendant stated that he had been doing drugs from the night of February 13, 2015, through the early morning hours of February 14, 2015. He was "extremely intoxicated." In his conversation with the detective, defendant said "thank you, God, I wasn't on the west or south side of Chicago or black and then north side cops don't know how to fight because otherwise I'd probably be dead." Defendant denied telling the detective that "those

officers were sitting in their car and five minutes later they were fighting for their lives." Defendant denied telling either the detective or assistant state's attorney that after he fired the gun his hand was "still on the trigger and [he] kept firing." Defendant denied yelling out "I am going to kill you" and did not recall if he said anything at all during the incident.

¶ 35    In rebuttal, Assistant State's Attorney Maureen Hughes testified that she worked in the felony review unit and spoke with defendant regarding the incident. Defendant never told Hughes he was intoxicated or suffering from bipolar disorder. After he stole products from the Walgreen's, defendant walked out and "the pipsqueak from Walgreen's followed after him." Defendant grabbed the officer's gun because he did not have a gun and did not want to get shot. After fighting with the officers over the gun, defendant fired it. He kept his hand on the gun and pulled the trigger two or three more times. Defendant kept his hand on the gun, "until somebody pried his fingers from the gun * * * because four people were on top of him." On cross-examination, Hughes stated she wrote a summary of the incident after the interview.

¶ 36    In closing, defendant argued he lacked the intent for attempt first degree murder and was attempting to disarm the officer where he pointed the gun away from the officers and pulled the trigger. The court questioned counsel regarding defendant's taking the gun from the officer's holster, the process for how defendant was going to clear the weapon, and defendant's reason for taking the gun from one officer's holster. Counsel noted defendant's testimony that he was pointing the gun "deliberately away" from the officer towards the wall of the Walgreen's "intending to clear the weapon because he feared it would be used against him." Counsel noted defendant's testimony was clear: he did not have the specific intent to kill the officers. His fear that the weapon would be used against him "may not have been a rational fear," but "he wanted to

disable the weapon, clear the weapon so that he could not be shot."

¶ 37    Several days later, after a continuance, the trial court found defendant guilty of four counts of attempted murder, three counts of aggravated discharge of a firearm, one count of disarming a peace officer, and one count of possession of a controlled substance.[3] In ruling, the court stated:

> "I heard the evidence and the arguments of counsel. * * * And I've inspected the evidence. Based on the testimony that I heard and the evidence that I heard, it's clear to me that at the time of this event, that this individual disarmed a police officer and tried to use that weapon to kill these two police officers.
>
> In the scheme of circumstances, it would be possible, I suppose, that during a struggle a weapon goes off unintentionally. But the three trigger pulls executed by this gentleman is instructive in determining what his intent was.
>
> This evidence proves beyond a reasonable doubt that this defendant is guilty of the crime of intent to commit murder."

¶ 38    Defense counsel filed a motion for reconsideration of the guilty finding and/or for a new trial. Defendant filed a *pro se* motion for a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), arguing his trial counsel was ineffective for various reasons, including that his counsel did not advance a theory of "diminished capacity from voluntary intoxication" as an affirmative defense and counsel did not consider arguing the effect of his bipolar disorder in contributing to his "drug induced mania," to which defendant's psychiatrist and therapist could testify.

¶ 39    At the hearing on the *Krankel* motion, the trial court questioned defense counsel as to why

---

[3] The trial court also found defendant guilty of two counts of aggravated battery of a peace officer, but the State notified the court at sentencing that it had intended to *nolle pros.* those counts.

he did not establish that defendant was in a drug-induced mania. Counsel responded that he informed defendant that "diminished capacity is not a legal defense in the State of Illinois and any intoxicated or drugged condition must be involuntarily produced, so these potential defenses were discussed and rejected because they are not legal defenses in Illinois." The trial court denied defendant's request for a *Krankel* hearing. It subsequently denied the motion for a new trial. The case proceeded to sentencing, where the court merged the counts and sentenced defendant to two terms of 24 years' imprisonment for attempt first degree murder, one for each officer, and 2 years' imprisonment for possession of a controlled substance, all to be served concurrently.

¶ 40    On appeal, defendant argues he should receive a new trial because the trial court denied him due process where it failed to remember or consider the crux of his defense. Defendant argues that, in rendering its judgment, the trial court made findings of fact that misstated the theory of the defense. Specifically, he argues the court's finding that "it would be possible, I suppose, that, during a struggle a weapon goes off unintentionally * * * [b]ut the three trigger pulls executed by [defendant] is instructive in determining what his intent was" was a misstatement and misunderstanding of the defendant's theory of the case. Defendant claims the court's comment shows it believed the theory of the defense was that the gun discharged by accident, which the court rejected given the three trigger pulls. Defendant states he never argued the gun discharged by accident, and instead gave a detailed account of his decision to intentionally fire the gun at a wall in order to disable it, and to clear the gun of live rounds. He argues the court's "failure to accurately recall" his testimony went to the heart of his defense, and led to the court rejecting his defense without truly understanding it. Defendant contends that, had the court truly understood the

nature of his defense, it could have found the State's argument that he deliberately aimed at the officer unconvincing.

¶ 41    Defendant acknowledges he failed to object to the court's alleged error at trial and raise his due process argument in a posttrial motion. See *People v. Sebby*, 2017 IL 119445, ¶ 48 (failure to preserve a purported error for review by objecting to the error at trial and raising the error in a posttrial motion results in forfeiture). Nevertheless, he argues the forfeiture rule is less rigidly applied when, as here, the basis for the objection is the trial court's conduct. See *People v. Nevitt*, 135 Ill. 2d 423, 455 (1990) (citing *People v. Sprinkle*, 27 Ill.2d 398, 400-01 (1963)). Defendant argues alternatively that the trial court's misstatement of the central theory of his case is reviewable under the fundamental fairness prong of the plain error doctrine. See *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) (The plain-error doctrine applies when a clear or obvious error occurred and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) * * * that error is so serious that it affected the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' ") (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). However, "[w]hether we consider the issue on the merits or through the lens of a plain error analysis, the first step is to determine whether error occurred." *People v. Simon*, 2011 IL App (1st) 091197, ¶ 89. We find no error here.

¶ 42    A trial court must consider all matters in the record before deciding the case. *People v. Bowie*, 36 Ill. App. 3d 177, 180 (1976). Accordingly, "a trial court's failure to recall and consider testimony crucial to defendant's defense [will result] in a denial of defendant's due process rights." *People v. Mitchell*, 152 Ill. 2d 274, 323 (1992). A defendant will not have received a fair trial

where the record " 'affirmatively indicates * * * that the trial judge did not remember or consider the crux of the defense when entering judgment.' " *Simon*, 2011 IL App (1st) 091197, ¶ 91 (citing *Bowie*, 36 Ill. App. 3d at 180). Whether a defendant's due process rights have been violated is a legal issue to be reviewed *de novo*. *People v. Williams*, 2013 IL App (1st) 111116, ¶ 75.

¶ 43 Nevertheless, "[i]n a bench trial, the trial court is presumed to have considered only competent evidence in reaching its verdict, unless that presumption is rebutted by affirmative evidence in the record." *People v. Simon*, 2011 IL App (1st) 091197, ¶ 91. Additionally, the judge in a bench trial has the responsibility to weigh the evidence, resolve conflicts, and draw reasonable inferences, and the State, therefore, has the benefit of all reasonable inferences. *People v. Moon*, 2019 IL App (1st) 161573, ¶ 36. Further, "if a trial court's 'minor misstatement' of the evidence did not affect the basis of the ruling, it does not violate due process." *People v. Williams*, 2017 IL App (1st) 150795, ¶ 39 (quoting *People v. Schuit*, 2016 IL App (1st) 150312, ¶ 107).

¶ 44 We find the trial court did not deny defendant his due process rights in rendering its judgment. First, a trier of fact in a bench trial "is not required to mention everything—or, for that matter, anything—that contributed to its verdict," and failure to specifically mention portions of a defendant's testimony "does not permit a defendant on appeal to claim that those portions not mentioned played no role in the court's determination." *People v. Curtis*, 296 Ill. App. 3d 991, 1000 (1998). Thus, any argument that the trial court failed to consider defendant's defense theory merely because it did not specifically address it or mention defendant's testimony is without merit.

¶ 45 Second, the court's statement that a weapon could discharge unintentionally during a struggle does not "affirmatively demonstrate" the court did not remember or consider the crux of the defense, or it did not accurately recall defendant's testimony. Again, the trial court did not have

to specifically address defendant's testimony or defense theory in ruling, and its statement regarding the possibility that the firearm discharge was unintentional is a reasonable statement regarding what might happen when multiple people struggle over a firearm.

¶ 46 Defendant relies on *People v. Bowie*, 36 Ill. App. 3d 177 (1976), to establish that the trial court misremembered his testimony and defense. In *Bowie*, the defendant was found guilty of battery and resisting a police officer following conflicting testimony from the defendant and a police officer regarding who struck the first blow. *Bowie*, 36 Ill. App. 3d at 178-79. The defendant testified at trial that he was beaten over the head with a policeman's club, causing his head to bleed. *Id*. at 179. However, during closing argument, when defense counsel referenced the defendant's testimony that he was injured and bleeding, the trial court stated it "heard nothing about * * * the defendant stating * * * that he was bleeding, strike that out." *Id.* at 180. This court reversed and remanded, finding the record affirmatively indicated the trial court did not properly consider the crux of defendant's defense when entering judgment and defendant was therefore denied a fair trial. *Id*.

¶ 47 We find *Bowie* distinguishable. Unlike in *Bowie*, the record here contains no "affirmative evidence" that the trial court misstated any of the evidence or misunderstood defendant's defense. Defendant's claims as to this point amount to pure speculation. In fact, unlike in *Bowie*, the record here shows the court questioned defense counsel closely regarding his theory of the case during closing argument, only days before the court rendered its judgment, thus demonstrating the court's awareness of that defense theory. Defendant points to no affirmative evidence demonstrating, as he claims on appeal, that the court somehow "misunderstood or forgot" the defense theory between

the time it heard the case and the time it rendered judgment. Accordingly, we find no error or denial of a due process based on the court's statements.

¶ 48     Defendant also argues we should remand the case for a new *Krankel* hearing where the trial court failed to appoint a new attorney to present defendant's claims of ineffective assistance of counsel even though defendant's claims established his trial counsel did not adequately consider the possibility of advancing a theory of diminished capacity due to voluntary intoxication or adequately explore whether his diagnosis for bipolar disorder may have contributed to his "drug-induced mania."

¶ 49     A *pro se* posttrial motion alleging ineffective assistance of counsel is governed by the procedure developed by the court in *Krankel*, 102 Ill. 2d 181, which encourages the trial court to fully address the claims alleged and narrow the issues to be addressed on appeal. *People v. Roddis*, 2020 IL 124352, ¶ 34. A court will not automatically appoint new counsel to every defendant who presents a *pro se* posttrial motion alleging ineffective assistance of counsel, but rather must first examine the factual and legal merits of defendant's claim. *Id.*, ¶¶ 35, 61. If the court determines the claim lacks merit or pertains only to matters of trial strategy, it need not appoint counsel and may deny the motion. *Id.*, ¶ 35. A claim lacks merit if it is conclusory, misleading, or legally immaterial, or does not bring to the trial court's attention a colorable claim of ineffective assistance of counsel. *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 71. If the allegations show possible neglect, new counsel should be appointed. *Roddis*, 2020 IL 124352, ¶ 35.

¶ 50     The purpose of a preliminary *Krankel* inquiry is to ascertain the underlying factual basis for the ineffective assistance claim and to "afford" the defendant an opportunity to explain and support his claim. *People v. Ayres*, 2017 IL 120071, ¶ 24. In making this preliminary inquiry, the

trial court is permitted to discuss defendant's allegations with trial counsel and defendant, and "is permitted to make its determination based on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations." *People v. Ayres*, 2017 IL 120071, ¶ 12. "[A] brief discussion between the trial court and the defendant" may be adequate to determine whether further action is required regarding the defendant's claims. *People v. Moore*, 207 Ill. 2d 68, 78 (2003). The issue of whether a trial court properly conducted a preliminary *Krankel* inquiry presents a legal question which we review *de novo*. *People v. Jolly*, 2014 IL 117142, ¶ 28.

¶ 51     In this case, the trial court conducted a preliminary *Krankel* inquiry during which it not only discussed defendant's allegations with him but questioned defense counsel regarding defendant's claim that counsel was ineffective for failing to raise a defense regarding his diminished capacity and mental state. The court specifically asked counsel about the "drug induced mania," which defendant wanted to establish through testimony from his psychiatrist and therapist regarding his bipolar disorder. Counsel responded that he discussed potential defenses with defendant and told defendant that "diminished capacity is not a legal defense in the State of Illinois and any intoxicated or drugged condition must be involuntarily produced, so these potential defenses were discussed and rejected because they are not legal defenses in Illinois."

¶ 52     Defense counsel accurately stated the law in Illinois. See, *e.g.*, *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 70 ("An expert may not give an opinion supporting the doctrine of diminished mental capacity, because, as we have previously stated, that doctrine is not recognized in Illinois"); *People v. Himber*, 2020 IL App (1st) 162182, ¶ 55 (voluntary intoxication cannot be asserted as an affirmative defense to negate the element of intent); 720 ILCS 5/6-3 (West 2014) ("A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such

condition is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law").

¶ 53    Citing *People v. Freedman*, 4 Ill. 2d 414 (1954), defendant contends the *Krankel* inquiry here showed defense counsel's possible neglect. He contends counsel's responses to the trial court's questioning suggested he did not know that, although voluntary intoxication cannot be an affirmative defense, voluntary intoxication remains a viable, relevant factor that could be used to negate the specific intent required to establish attempt murder. See *Freedman*, 4 Ill. 2d at 419 ("While voluntary intoxication affords no excuse for crime, an offense which is by law made to depend upon the state or condition of the mind of the accused cannot be committed by one who is incapable of forming the specific intent."); *People v. Trinkle*, 68 Ill. 2d 198, 203 (1977) (attempt murder requires the specific intent to commit murder).

¶ 54    This court has held that voluntary intoxication may be relevant " 'where voluntary intoxication is so extreme as to suspend entirely the power of reasoning,' [such that] a defendant is incapable of forming a specific intent or malice." *People v. Slabon*, 2018 IL App (1st) 150149, ¶ 33 (quoting *People v. Cunningham*, 123 Ill. App. 2d 190, 209 (1970)). However, notwithstanding defendant's contention to the contrary, we do not find the trial evidence presented "plenty" of evidence that defendant was severely intoxicated, let alone that his intoxication was "so extreme" (*Id.*) as to suspend his ability to reason. During trial, defense counsel presented evidence regarding defendant's intoxication during the evening of February 13, 2015, and early hours of February 14, 2015, drawing out testimony that he had imbibed "at least six beers, three or four shots of hard liquor, three blunts of marijuana, a couple of joints, and at least two grams of [MDMA]." Defendant testified he went to the Walgreen's as he was "very intoxicated" and wanted something

"that would bring [him] down immediately so [he] could think clear," and that he was feeling "anxious, "wired," and "very strong" at the time of the shooting. But feeling wired, anxious, and strong does not support a theory that defendant lacked the "power of reasoning" such that he was incapable of forming the specific intent to kill the officers. Similarly, White's testimony that, when the officers were trying to restrain defendant, "they could not stop him[,] [h]e was like a machine, [and] just kept going and kept going" does not suggest extreme intoxication such that defendant's ability to reason was suspended.

¶ 55    Further, defendant's own testimony that he intended to "clear" Groh's weapon by removing the magazine, turning away from the officers, and shooting the remaining bullet at a brick wall does not support an argument that he lacked the *mens rea* for attempt murder due to his intoxication, since he was apparently not so intoxicated that he could not develop this intricate plan and put it into action. In fact, trial strategy dictated that counsel could not argue defendant was so extremely intoxicated that his "power of reasoning" was entirely suspended (*Slabon*, 2018 IL App (1st) 150149, ¶ 33), as this would negate the defense theory that defendant intentionally fired the gun in order to disarm it, based on his *reasoning* that it then could not be used against him. See *People v. Jackson*, 2020 IL 124112 (Where an allegation "relates to trial strategy, it cannot serve as the basis of a *Krankel* claim).

¶ 56    In sum, the trial court conducted a proper *Krankel* inquiry into defendant's claims that defense counsel neglected his case by failing to pursue defenses related to his intoxication and/or diminished capacity where the claims were legally and factually without merit.

¶ 57    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 58    Affirmed.